

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-14-1997

# Robinson v. City of Pittsburgh

Precedential or Non-Precedential:

Docket 95-3594

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Robinson v. City of Pittsburgh" (1997). *1997 Decisions.* Paper 157.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/157

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 14, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-3594

CARMEN L. ROBINSON; NATHANIEL HAWTHORNE, JR.,
Wife and Husband,

Appellants

v.

CITY OF PITTSBURGH, EARL BUFORD, CRAIG B.
EDWARDS; JAMES N. DICKERSON

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 94-1378)

Argued: January 6, 1997

Before: GREENBERG, COWEN, and ALITO, Circuit Judges

(Opinion Filed: July 14, 1997)

SAMUEL J. CORDES (Argued)
OGG, JONES, CORDES
 & IGNELZI, L.L.P.
245 Fort Pitt Boulevard
Pittsburgh, PA 15222

 Attorney for Appellants

JACQUELINE R. MORROW
CITY SOLICITOR

JOHN G. SHORALL (Argued)
Assistant City Solicitor
SUSAN E. MALIE
Assistant City Solicitor
City of Pittsburgh
Department of Law
313 City-County Building
Pittsburgh, PA 15219

 Attorneys for Appellee

**OPINION OF THE COURT**

ALITO, Circuit Judge:

Appellants Carmen Robinson and Nathaniel Hawthorne,
Jr. worked as police officers for appellee City of Pittsburgh
("the City"). Robinson alleges that she was sexually
harassed by appellee James Dickerson (her supervisor) and
that appellees Craig Edwards (an assistant police chief) and
Earl Buford (the chief of police) knew of the harassment but
failed to take action to stop it. Robinson asserted a variety
of claims under both federal and state law against
Dickerson, Edwards, Buford, and the City. At the close of
plaintiffs' case, the district court granted defendants'
motion for judgment as a matter of law on several of
Robinson's claims. The jury returned verdicts for
defendants on the claims that remained. In this appeal,
plaintiffs challenge the grant of judgment as a matter of
law, a jury instruction, and certain evidentiary rulings. We
affirm in part, reverse in part, and remand.

I.

Robinson began working as a Pittsburgh police officer in
1990. Hawthorne, her husband, also worked as a police
officer for the City. In January 1992, Robinson was
assigned to a drug suppression unit commanded by then-

2

Lieutenant Dickerson. Hawthorne worked in the same unit until June 1992, and Robinson contends that after he left to begin a new assignment, Dickerson began sexually harassing her. According to Robinson, the harassment included unhooking her bra, snapping her bra strap, touching her hair and ears, telling her "you stink pretty," making comments about the size of her breasts, blowing her a kiss, asking her out for a drink, touching her leg under a table, putting his hands around her waist, dropping his keys down the back of her shirt and attempting to retrieve them, and describing the position in which he and Robinson would have sex if they were to do so. Robinson testified that she never acceded to any of Dickerson's sexual advances or reciprocated any of his sexual remarks and that she made it clear to him that his conduct was unwelcome.

In the fall of 1992, Robinson approached Assistant Chief Edwards to inquire about a transfer to the detective bureau (which would have been a promotion). Edwards had no direct supervisory authority over Robinson, but was one of two second-in-command officers who reported directly to Chief Buford. (App. 89-90; 585-86) Robinson testified that she told Edwards that she thought Dickerson "was hitting on [her]" and "coming on to [her]." (App. 146-47) She said that Edwards advised her to "wait it out" because he thought that Chief Buford might be leaving soon for another job. Edwards reportedly said that Buford might take Dickerson with him and that even if Dickerson remained, Buford's departure would allow Edwards to obtain power over Dickerson. (App. 147) Until then, however, Edwards allegedly told Robinson he could not do anything about Dickerson because Buford protected him. (App. 147-48) In addition, according to Robinson, Edwards told her that Buford would not do anything to help her because Dickerson "had done this before" and Buford had not done anything following that incident. (App. 148) Robinson testified that she believed "waiting it out" was a "viable solution" and that she did not tell her husband about the harassment or do anything else about it at the time. (App. 149)1

_____

1. In addition to this request, Robinson sought a transfer to the detective bureau on several other occasions, but she never succeeded in obtaining such a transfer.

3

In May 1993, Robinson wrote a letter to Buford in which she asked to meet with him. According to Robinson, her original draft of the letter, prepared in March or April 1993, stated that Dickerson was "coming on to [her]" and that she thought that this was "the reason for [her] now bad reputation." (App. 168) Robinson recounted that she gave the letter to Edwards to look over and that Edwards told her that she could not send the letter through the chain of command because it was too "specific in detail." According to Robinson, Edwards recommended that she "just be specific about requesting a meeting." (App. 166-67) The original draft was never introduced in evidence. The letter that was actually sent to Buford requested a meeting in order to discuss "career goals" and "past conflicts" and to "seek guidance with future endeavors." The letter made no mention of sexual harassment. Upon receipt of the letter, Buford returned it to Robinson with a notation that it needed to be transmitted through the proper chain of command rather than sent directly to him.

In January 1994, Robinson was detailed to the criminal intelligence unit, where her direct supervisor was Sergeant William Bochter and her second-line supervisor was Chief Buford. In this assignment, neither Dickerson nor Edwards possessed any supervisory authority over Robinson. In May 1994, Robinson met with Edwards, told him she was "fed up" with the harassment, and stated her intention to file a complaint. She testified that Edwards recommended that she file a complaint with the Equal Employment Opportunity Commission ("EEOC").

A few weeks later, Robinson filed a complaint with Bochter, who forwarded it to Buford on May 31, 1994. On June 1, 1994, Robinson filed a complaint with the EEOC alleging that Dickerson had sexually harassed her, and on July 6, 1994, she filed a similar complaint with the Bureau of Police Office of Professional Standards ("OPS"). OPS's investigation, which was completed in September 1994, concluded that probable cause existed to substantiate Robinson's claim.2 In October 1994, Robinson stopped

_____

2. The district court did not allow the OPS report itself to be introduced in evidence, but it permitted the investigating officer, Carla Gedman, to testify as to her conclusions on the ground that they were admissions by a party-opponent and thus not hearsay.

4

reporting for work, and she has not returned to her job since that time. She was nonetheless promoted to sergeant in February 1995.

II.

In August 1994, Robinson and Hawthorne filed suit in district court against the City, Buford, Edwards, and Dickerson. Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), Robinson asserted claims against the City for hostile work environment and quid pro quo sexual harassment and for retaliation, as well as a claim for hostile work environment sexual harassment against Dickerson. Under 42 U.S.C. § 1983, she asserted claims, based on alleged violations of the Equal Protection Clause, against all four defendants. She claimed that all four were responsible for unconstitutional sex-based discrimination and that all but Dickerson were liable for unlawful retaliation. In addition, Robinson asserted claims under Pennsylvania law for assault, battery, and intentional infliction of emotional distress against Dickerson. Robinson sought punitive damages on all claims. Hawthorne sued Dickerson under Pennsylvania law for loss of consortium. Dickerson counter-claimed against Robinson for defamation.

At the close of plaintiffs' case, defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The district court granted defendants' motion as to the Title VII hostile work environment claim against Dickerson because individuals cannot be liable under that statute. See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996) (en banc). The court granted the motion as to all of Robinson's § 1983 claims against the City on the ground that there was insufficient evidence of an unconstitutional policy or custom. Furthermore, with respect to the Title VII retaliation claim against the City (and in the alternative with respect to the § 1983 retaliation claim against the City, Buford, and Edwards), the court held that Robinson had not shown a causal link between her protected activity and any adverse employment action. The court granted the motion with respect to Robinson's Title VII quid pro quo claim against

5

the City because the court found insufficient evidence that a job benefit or detriment was conditioned upon Robinson's response to Dickerson's advances or that her response to his advances in fact affected a tangible aspect of her employment. Moreover, the court granted defendants' motion as to the § 1983 claims against Buford and Edwards on the ground that there was insufficient evidence that either was personally involved in any deprivation of Robinson's rights (as well as, with respect to the retaliation theory, on the alternative ground described above). Finally, the court granted the motion as to the intentional infliction claim against Dickerson and struck Robinson's demand for punitive damages on all claims because there was insufficient evidence of outrageous conduct.

The claims that went to the jury were thus as follows: (1) the Title VII hostile work environment claim against the City; (2) the § 1983 sex discrimination claim against Dickerson; (3) the assault and battery claims against Dickerson; (4) Hawthorne's loss of consortium claim against Dickerson; and (5) Dickerson's defamation counter-claim. The jury returned verdicts for the defense on all of plaintiffs' claims, as well as a verdict for Robinson on the counter-claim.

Robinson appeals from the grant of judgment as a matter of law on all claims except the Title VII and intentional infliction claims against Dickerson.3 In addition, she contests certain evidentiary rulings and a jury instruction that allegedly affected the jury's rejection of the claims that it was permitted to consider. Nothing is at issue in this appeal with respect to the defamation counter-claim, the assault and battery claims, or the loss of consortium claim.

We exercise plenary review over the district court's grant of judgment as a matter of law. Delli Santi v. CNA Ins. Co., 88 F.3d 192, 200 (3d Cir. 1996). "Our role is to determine

_____

3. Robinson's statement of issues includes the question whether the court properly granted judgment as a matter of law on what she describes as her "claim" for punitive damages, Appellants' Br. at 2, but her brief does not mention this issue. She has therefore waived it. Pennsylvania v. Dept. of Health and Human Services, 101 F.3d 939, 945 (3d Cir. 1996).

6

whether the evidence and justifiable inferences most favorable to the [non-moving] party [would have] afford[ed] any rational basis" for a verdict in favor of the non-moving party. Id. (quotation omitted). We exercise plenary review over the jury instructions given by the district court in order to determine whether, read as a whole, the instructions stated the correct legal standard. Miller v. CIGNA Corp., 47 F.3d 586, 591 (3d Cir. 1995) (en banc). Finally, we review the district court's decisions to admit or exclude evidence for abuse of discretion, Glass v. Philadelphia Elec. Co., 34 F.3d 188, 191 (3d Cir. 1994), although our review is plenary as to the interpretation or application of a legal standard underlying such a decision. West v. Philadelphia Elec. Co., 45 F.3d 744, 752 (3d Cir. 1995). We will not reverse on the basis of an erroneous decision to admit or exclude evidence unless the error affected a "substantial right" of the aggrieved party. Id.

III.

Section 1983 Equal Protection Claim Against Buford, Edwards, and the City

To prevail on her § 1983 equal protection claim, Robinson was required to prove that she was subjected to "purposeful discrimination" because of her sex. Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1993). Moreover, to hold Buford or Edwards liable under § 1983 for such an equal protection violation, Robinson was required to prove that they personally "participated in violating [her] rights, . . . that [they] directed others to violate them, or that [they] . . . had knowledge of and acquiesced in [their] subordinates' violations." Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995). See also Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990). Robinson does not contend that either Buford or Edwards personally engaged in any discriminatory conduct against her or that they directed anyone else to do so. Rather, her argument is that Buford and Edwards were aware of and acquiesced in Dickerson's sexual harassment. We must thus determine, taking Robinson's evidence as true and giving her the benefit of all reasonable inferences, what Edwards and

7

Buford knew about the harassment, when they learned about it, and what, if anything, they did in response.

A. Robinson does not seek to hold Edwards liable for anything that he did or did not do following her May 1994 complaint. Rather, she contends that she told Edwards in 1992 that Dickerson was "hitting on [her]" and that Edwards "acquiesced" in Dickerson's conduct because he did not take any action to stop Dickerson but instead told Robinson to "wait it out" because Buford and/or Dickerson might soon be changing jobs.

Edwards responds that the jury's verdict for the City on Robinson's Title VII hostile work environment claim conclusively establishes that he cannot be liable under § 1983 for acquiescing in her subjection to a hostile environment. If there was no hostile environment in the first place, Edwards's argument goes, then he logically cannot be liable for knowingly acquiescing in the existence of one. We reject this argument because, among other things, it ignores the fact that the jury's verdict does not necessarily mean that it found that Robinson was not subjected to a hostile work environment. Instead, the jury might have rejected her Title VII hostile work environment claim on the ground that the City had an effective policy against sexual harassment. See, e.g., Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 110 (3d Cir. 1994).

We agree with Edwards, however, that there was insufficient evidence to show that he knew of and acquiesced in Dickerson's alleged sexual harassment. It is true that the jury could have found that Edwards knew in 1992 that Dickerson was "hitting on" Robinson and that Edwards did not take any action to stop Dickerson's conduct. But it is undisputed that, while Edwards had a higher rank than Dickerson, he possessed no actual supervisory authority over him. (App. 1031-32) Regardless of whether the evidence presented by Robinson would be adequate if Edwards had actual supervisory authority over Dickerson, we do not believe that Edwards can be held liable under § 1983 for failing to take action to correct the behavior of an individual over whom he had no actual control.

8

"A defendant in a [§ 1983] action must have <u>personal involvement</u> in the alleged wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (emphasis added). See also, e.g., Andrews, 895 F.2d at 1478 ("there must be some affirmative conduct by the supervisor that played a role in the discrimination") (citing Rizzo v. Goode, 423 U.S. 362, 377 (1976)). Our cases have held that "actual knowledge and acquiescence" suffices for supervisory liability because it can be equated with "personal direction" and "direct discrimination by the supervisor." Id. (quoting Rode, 845 F.2d at 1207). Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor "acquiesced" in (i.e., tacitly assented to or accepted) the subordinate's conduct.4 But where actual supervisory authority is lacking, mere inaction, in most circumstances, does not reasonably give rise to a similar inference. As a general matter, a person who fails to act to correct the conduct of someone over whom he or she has no supervisory authority cannot fairly be said to have "acquiesced" in the latter's conduct.

General tort principles provide a useful analogy. Unless a "master"-"servant" relationship exists, the circumstances in which one person may be held liable for a tort committed by another are quite limited, see Restatement (Second) of Torts §§ 876-878 (1977), and none appears to be applicable here. A claim against a "master" based on a tort committed by a "servant" bears a resemblance to a § 1983 claim against a government supervisor based on a constitutional tort committed by a subordinate,5 but a person cannot be a "master" unless he or she has "the right to control the physical conduct" of the servant. Restatement (Second) of Agency § 2(1) (1957). By analogy, we hold that, except perhaps in unusual circumstances, a government official or employee who lacks supervisory authority over the person who commits a constitutional tort cannot be held, based on

_____

4. See Webster's Third New International Dictionary 18 (1971); Random House Dictionary of the English Language Unabridged Ed. 13 (1967).

5. We do not suggest, however, that all rules applicable to the former type of claim may be applied by analogy to the latter.

9

mere inaction,6 to have "acquiesced" in the unconstitutional conduct.

Here, it is clear that Edwards did not control or have the right to control Dickerson's physical conduct in the performance of his job, and Edwards is thus not liable for Dickerson's conduct.7 Accordingly, we affirm the district

_____

6. Of course, if the government official or employee had sufficient personal involvement in the constitutional tort, he or she may be held liable. In this context, the rules set out in §§ 876 and 877(a) of the Restatement (Second) of Torts provide useful guidance. Section 876 states:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a b reach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in a ccomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Section 877(a) provides:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) orders or induces the conduct, if he knows or should know of circumstances that would make the conduct tortious if it were his own . . . .

7. All of our prior cases discussing the issue of supervisory liability for "acquiescence" involved defendants who had actual authority to control the conduct of the person alleged to have violated the plaintiff's rights. Our decision here is thus fully consistent with our holdings in those cases.

For example, in Baker, 50 F.3d at 1193-94, we held that the officer who was in charge of a drug raid could be liable under § 1983 for certain allegedly illegal actions taken by the officers under his command where there was "sufficient evidence to permit an inference that [the commanding officer] knew of and acquiesced in the treatment the [plaintiffs] were receiving at the hands of the other officers acting under

10

court's grant of judgment as a matter of law to Edwards on Robinson's § 1983 equal protection claim.

B. Robinson argues that Buford is liable under§ 1983 for Dickerson's conduct because Buford "took absolutely no action to remedy Robinson's situation, and the evidence suggests that he thought Dickerson's conduct a joke." Appellants' Br. at 22. We disagree, because we are unable to find any evidence that Buford had any knowledge of any alleged harassment before May 1994. (As with Edwards, Robinson does not argue that Buford is liable based on anything he did or failed to do following her May 1994 complaint.)

Robinson testified that Edwards told her in 1992 that it would not serve any purpose for him to forward her complaint to Buford because Buford would not take it seriously. It seems most doubtful that Edwards's statement would have been admissible at trial against Buford, but in

_____

his supervision." 50 F.3d at 1193. The commanding officer indisputedly had the authority to control the conduct of the officers under his command.

In Keenan, 983 F.2d at 465-68, the plaintiffs alleged that they were transferred in retaliation for protected activity, and the jury agreed. We held that four supervisors could be liable under § 1983 where they knew of the plaintiffs' protected activity and approved the transfers anyway. Id. at 468. We concluded that "the evidence [was] sufficient to establish that the plaintiffs were impermissibly disciplined by [the four supervisors] for conduct that constituted protected activity." Id. Keenan is distinguishable because the four supervisors approved the transfers and possessed formal authority over their respective subordinates who recommended the transfers.

In Andrews, 895 F.2d at 1478-79, the supervisors not only had direct authority over the primary harassers but also were personally involved in the unconstitutional conduct. We upheld a verdict against one supervisor who "personally participated in" and "condoned" the harassment perpetrated by other officers under his supervision. As to another supervisor, "the man who was ultimately responsible for the conduct of the Division," we held that the evidence supported the jury's finding that he was aware of the harassment and not only did nothing to stop it, but told the plaintiff that "you have to expect this working with the guys." Id. at 1479.

11

any event this statement in no way tends to show that Buford in fact was aware in 1992 that Dickerson was sexually harassing Robinson. The uncontradicted evidence shows that Buford first learned of Robinson's complaint when Bochter told him about it on May 31, 1994. We therefore affirm the district court's grant of judgment as a matter of law to Buford on Robinson's § 1983 equal protection claim.

C. Our conclusion that Buford is not liable under § 1983 for Dickerson's alleged sexual harassment requires us to reject as well Robinson's submission that the City is liable under § 1983 for Dickerson's alleged sexual harassment. The City, as a municipality, is not liable through respondeat superior for the constitutional torts of its employees. Monell v. Dept. of Social Services, 436 U.S. 658 (1978). Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of. Id. at 694. As we explained in Andrews:

A government policy or custom can be established in one of two ways. Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, such practices of state officials [are] so permanent and well-settled as to virtually constitute law.

895 F.2d at 1480 (quotations omitted) (emendations in original).

Robinson does not argue that the City is liable because it maintained a "custom" of permitting sexual harassment. Rather, she asserts that the City is liable through Buford, who is concededly a policymaker whose conduct is attributable to the City. In accordance with our holding that Buford is not liable under § 1983 for Dickerson's alleged sexual harassment, we conclude that the City likewise is not liable under § 1983. We therefore affirm the

12

district court's grant of judgment as a matter of law to the City on Robinson's § 1983 equal protection claim.

IV.

Title VII Quid Pro Quo Sexual Harassment Claim Against the City

In addition to claiming that Dickerson's sexual harassment created a hostile work environment, Robinson alleged that Dickerson engaged in quid pro quo sexual harassment, for which the City was liable under Title VII. The district court granted judgment as a matter of law for the City on this claim, but we hold that Robinson presented sufficient evidence to go to the jury on this claim.8

A. This court has not yet had occasion to consider the elements of a quid pro quo claim, but we agree with the formulation set out in 29 C.F.R. § 1604.11(a)(1) and (2), which provides:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individuals. . ..

See also, e.g., Heyne v. Caruso , 69 F.3d 1475, 1478 (9th Cir. 1995); Cram v. Lanson & Sessions, 49 F.3d 466, 473 (8th Cir. 1995); Karibian v. Columbia University , 14 F.3d 773, 777 (2d Cir. 1994); Martin v. Nannie and the

_____

8. We reject at the outset defendants' contention that there is no evidence that Dickerson ever made a sexual advance to Robinson. The record is replete with evidence of implicit sexual advances, so we take defendants to mean that only an explicit request for sex qualifies as a sexual advance. We disagree. We note simply that the evidence previously summarized concerning Dickerson's alleged statements and actions would have entitled the jury to find that Dickerson made sexual advances to Robinson.

13

Newborns, Inc., 3 F.3d 1410, 1416 (10th Cir. 1993); Lipsett
v. University of Puerto Rico, 864 F.2d 881, 898 (1st Cir. 1988).9

Under this test, the consequences attached to an
employee's response to the sexual advances must be
sufficiently severe as to alter the employee's "compensation,
terms, conditions, or privileges of employment," 42 U.S.C.
§ 2000e-2(a)(1), or to "deprive or tend to deprive [him or
her] of employment opportunities or otherwise adversely
affect his [or her] status as an employee." 42 U.S.C.
§ 2000e-2(a)(2). This does not mean that the employee must
be threatened with or must experience " `economic' or
`tangible' discrimination." Meritor, 477 U.S. at 64. See also
Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). But
by the same token, not every insult, slight, or
unpleasantness gives rise to a valid Title VII claim. In
Meritor, the Supreme Court noted that "not all workplace
conduct that may be described as `harassment' affects a
`term, condition, or privilege of employment.' " 477 U.S. at
67. The Court also suggested that the " `mere utterance of
an ethnic or racial epithet which engenders offensive
feelings in an employee' would not affect the conditions of
employment to [a] sufficiently significant degree to violate
Title VII." Id. (quoting Rogers v. EEOC, 454 F.2d 234, 238
(5th Cir. 1971)). Thus, whether in a hostile work

_____

9. Courts have unanimously held that an employer is strictly liable for
quid pro quo harassment by a supervisor having actual or apparent
authority to carry out the threat or promise that is made to the victim.
See Karibian, 14 F.3d at 777. See also Meritor Sav. Bank, FSB v. Vinson,
477 U.S. 57, 76 (1986) (Marshall, J., concurring in the judgment) ("every
Court of Appeals that has considered the issue has held that sexual
harassment by supervisory personnel is automatically imputed to the
employer when the harassment results in tangible detriment to the
subordinate employee"). This rule differs from that which applies in a
hostile work environment case. See Bouton v. BMW of N. Am., Inc., 29
F.3d 103, 106-07 (3d Cir. 1994). This distinction has been criticized,
see, e.g., J. Hoult Verkerke, Notice Liability in Employment Discrimination
Law, 81 Va. L. Rev. 273, 277 (1995), but since the parties here have not
addressed the issue, we assume that the City would be liable for any
quid pro quo sexual harassment committed by Dickerson. Cf. Bouton, 29
F.3d at 106-07 (stating, in a case involving only a hostile environment
claim, that "[w]ithout the agency relationship, quid pro quo harassment
would be impossible, so the employer is responsible").

14

environment case or a quid pro quo case, objectionable conduct attributable to an employer is not always sufficient to alter an employee's terms, conditions, or privileges of employment and is thus not always sufficient to violate Title VII.

Subsections (1) and (2) of 29 C.F.R. § 1604.11(a) differ in that subsection (1) addresses cases in which an employee is told beforehand that his or her compensation or some other term, condition, or privilege of employment will be affected by his or her response to the unwelcome sexual advances, whereas subsection (2) addresses cases in which the employee's response to sexual advances is thereafter used as a basis for a decision concerning compensation, etc. Under subsection (1), a quid pro quo violation occurs at the time when an employee is told that his or her compensation, etc. is dependent upon submission to unwelcome sexual advances. At that point, the employee has been subjected to discrimination because of sex. (This is so, of course, because, if the employee had been a member of the opposite sex, his or her compensation, etc. presumably would not have been made dependent on submission.) Whether the employee thereafter submits to or rebuffs the advances, a violation has nevertheless occurred. Like the Second Circuit, we "do not read Title VII to punish the victims of sexual harassment who surrender to unwelcome sexual encounters. . . . The supervisor's conduct is equally unlawful under Title VII whether the employee submits or not." Karibian, 14 F.3d at 778.10

Similarly, there is a violation under subsection (1) even if the employee rebuffs the advances and his or her compensation, terms, conditions, or privileges of employment are not in fact altered, i.e., even if the supervisor does not follow through on his or her threat. The threat is sufficient to constitute "discriminat[ion] . . . with

_____

10. Whether the employee "submi[tted] to the supervisor's advances is certainly relevant" because it bears on "the issue whether the sexual advances were unwelcome, not whether unwelcome sexual advances were unlawful." Karibian, 14 F.3d at 779. In this case, it is undisputed that Robinson refused to submit to Dickerson's alleged advances, and it is clear that the jury would have been entitled to find that the advances were unwelcome.

15

respect to . . . compensation, terms, conditions, or privileges of employment, because of . . . sex." 11 42 U.S.C. § 2000e-2(a)(1). But see Gary v. Long, 59 F.3d 1391, 1396 (D.C. Cir. 1995).

Under subsection (2), a plaintiff must make a showing that differs significantly from that required under subsection (1). Under subsection (2), the plaintiff must show that his or her response to unwelcome advances was subsequently used as a basis for a decision about compensation, etc. Thus, the plaintiff need not show that submission was linked to compensation, etc. at or before the time when the advances occurred. But the employee must show that his or her response was in fact used thereafter as a basis for a decision affecting his or her compensation, etc.

B. Robinson contends that Dickerson linked her response to his advances to the job detriments of "a bad reputation at work" and "unjust reprimands." Appellants' Br. at 28-29. Robinson explains that "[m]any times after Robinson would reject him, Dickerson unjustifiably reprimanded her in a very harsh manner and in front of other officers; he continuously bothered her at work, even when she was not under his direct command; he phoned her at home and work for reasons unrelated to police business; and he made negative comments to her regarding her work and her marriage." Appellants' Br. at 29 (citations omitted).

We are not persuaded that these alleged actions, even when taken together, rose to the level of conduct affecting Robinson's "compensation, terms, conditions, or privileges" of employment. Formal reprimands that result in a notation in an employee's personnel file could be sufficiently concrete, but harsh words that lack real consequences are not. See Meritor, 477 U.S. at 67.

We reach a different conclusion with respect to Robinson's allegation that Dickerson blocked her transfer to the detective bureau because she refused to accede to his

_____

11. The fact that no adverse action was taken is of course relevant to the question whether a threat or promise was made.

16

advances. The record before us would certainly permit the conclusion that Robinson was denied a transfer to the detective bureau (which would have been a promotion) because she had performed unsatisfactorily in two undercover assignments, because she was unable to accept criticism or take direction, or for other valid work-related reasons. However, we believe that the record would also support a finding that Dickerson refused to recommend her transfer because she rebuffed his advances. It is undisputed that a supervisor's recommendation weighs very heavily in determining who is transferred, so the jury could conclude that Dickerson's refusal to recommend Robinson cost her the transfer. Accordingly, the evidence was sufficient to support a finding of quid pro quo harassment within the meaning of 29 C.F.R. § 1604.11(a)(2).12

Robinson testified that Dickerson told her on several occasions that he would recommend her for transfer to the detective bureau (App. 111, 113-14, 121-22, 142, 160-61), but that after a party at which Dickerson touched her leg under the table and pulled her into a compromising position for a photograph, he responded to her renewed inquiry about the transfer by telling her that "he had talked to the Chief and he had talked to other detectives, and they had all said I had a bad attitude," implying that this was the reason she had not been transferred. (App. 143) She also testified that, when she spoke to Edwards shortly thereafter, he confirmed that Dickerson had "been saying bad things about [her] lately to Buford and [him]." (App.

---

12. Robinson has not called to our attention any admissible evidence that Dickerson explicitly threatened her before or at the time he made a sexual advance that her response would affect her "compensation, terms, conditions, or privileges" of employment. See 29 C.F.R. § 1604.11(a)(1). In light of our conclusion that the evidence is sufficient to show that Dickerson in fact did use Robinson's response to his advances as a basis for a decision affecting her compensation, etc. within the meaning of subsection (2), we need not consider whether the evidence would support a finding that Dickerson imposed such a condition "implicitly" before or at the time he made the alleged advances within the meaning of subsection (1). On remand, the district court should decide whether Robinson can proceed to trial based only on the theory of quid pro quo harassment set out in 29 C.F.R. § 1604.11(a)(2) or whether she can rely on 29 C.F.R. § 1604.11(a)(1) as well.

17

145) When she asked Edwards how she should deal with that and told him that "none of it [what Dickerson had been saying] was true," he replied, "I know. I know Jim is like that. . . . Jimmy thinks he's a lover." (App. 146) Moreover, when Robinson asked Edwards why he thought Dickerson was saying bad things about her, Edwards said that "Dickerson would like to have nothing better than a 23-year-old girl like you." (App. 146) Robinson testified that, after Dickerson told her again in April 1993 that she would be transferred, Edwards "told [her] that he [didn't] know why Commander Dickerson said he was going to recommend [her], because he [Dickerson] made sure that [she] wasn't on that [March 1993 transfer] list." (App. 162)

We hold that this evidence is sufficient to entitle a reasonable factfinder to conclude that Robinson was denied a transfer to the detective bureau because she refused Dickerson's advances. We believe that, in contrast to minor slights like "negative comments," receiving or being denied a desired promotion is sufficiently serious and tangible to constitute a change in the employee's "terms, conditions, or privileges" of employment.13 If the jury finds that Robinson was subjected to unwelcome sexual advances and that her response to those advances was the basis for Dickerson's refusal to recommend her for such a transfer, Robinson will have proved that the City, through Dickerson, discriminated against her because of her sex with respect to the "compensation, terms, conditions, or privileges" of her employment. 42 U.S.C. § 2000e-2(a)(1). Accordingly, we reverse the district court's grant of judgment as a matter of law to the City on Robinson's claim under Title VII for quid pro quo sexual harassment.14

---

13. Here, although the transfer at issue would have been a promotion, Robinson has not directed us to any specific evidence that the transfer would have increased her compensation. Paragraph 43 of her complaint does allege that a "transfer to the position of detective from the position of patrolman . . . is a promotion and carries with it an increase in annual compensation . . . ." (App. 27) Moreover, there appears to have been a stipulation between the parties with respect to the difference in pay between the detective level and the patrolman level. (App. 1310)

14. The jury returned a verdict for Dickerson on Robinson's claim under § 1983 against Dickerson for discriminating against her because of her

18

V.

Title VII and § 1983 Retaliation Claims Against the City,
Buford, and Edwards

Robinson contends that, after she filed her complaint
with the EEOC, she suffered reprisals at work. Section
704(a) of Title VII, 42 U.S.C. § 2000e-3(a), makes it "an
unlawful employment practice" for "an employer" to
"discriminate" against an employee "because he [the
employee] has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding,
or hearing under [Title VII]." Robinson sued the City for
retaliation under the above-quoted provision of Title VII.
She also sued Buford and Edwards for retaliation under
§ 1983, apparently for violating her right, secured by the
same provision of Title VII, to protest discrimination.

In Nelson v. Upsala College, 51 F.3d 383 (3d Cir. 1995),
we set forth the elements of a retaliation claim:

To establish discriminatory retaliation under Title VII,
a plaintiff must demonstrate that: (1) she engaged in

_____

sex, in violation of the Equal Protection Clause. Since this claim was
allowed to go the jury after the court granted judgment as a matter of
law on Robinson's quid pro quo and retaliation theories, it would appear
that this claim was founded upon a hostile work environment theory. It
is unclear from the record before us whether this claim was also founded
upon a theory of quid pro quo harassment. If it was, our discussion in
this section applies equally to it, and it should be tried on remand along
with Robinson's Title VII quid pro quo claim against the City. (Unlike
with respect to the § 1983 claims against Buford, Edwards, and the City,
there is no legal issue regarding Dickerson's personal liability under
§ 1983.) We of course recognize that federal pleading rules are liberal,
but it could be unfair for Robinson to assert a claim on remand that she
did not make clear in the earlier proceedings in the district court.
Compare Appellants' Br. at 2, 4, 28 (referring to a claim under § 1983 for
quid pro quo harassment, though apparently only against the City) with
Appellees' Br. at 22 (noting Robinson's references to a purported § 1983
claim for quid pro quo harassment, but stating that the district court
"analyzed Robinson's quid pro quo claim under a strict Title VII
analysis"). We leave it to the district court to determine whether on
remand Robinson should be permitted to pursue a claim against
Dickerson under § 1983 on a quid pro quo theory.

19

activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.

Id. at 386 (citations omitted). See also Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (same); Delli Santi v. CNA Ins. Co., 88 F.3d 192, 198 (3d Cir. 1996) (same, under New Jersey law).

It is undisputed that Robinson's EEOC complaint constitutes protected activity under Title VII. The district court granted judgment as a matter of law to defendants on Robinson's retaliation claims on the ground that she had not presented evidence that the alleged reprisals were the result of the protected activity. (App. 1029) On appeal, Robinson argues that the court erred in evaluating her evidence of retaliation. She submits that she was subjected to the following acts of reprisal due to the filing of her EEOC complaint:

restricted job duties, reassignment and subsequent failure to transfer her out of an assignment in which she was under the direct command of the alleged harasser, and the issuance of several unsubstantiated oral reprimands against her. Additionally, she testified that after refuting one of his advances, Dickerson sometimes would not talk to her, or would make unnecessary derogatory comments to her. . . [Moreover, she testified that] "Chief Edwards told me that he didn't know why Commander Dickerson said he was going to recommend me, because he made sure that I wasn't on that [transfer] list."

Appellants' Br. at 27 (citations omitted).

A. In our view, much of the allegedly retaliatory conduct of which Robinson complains, even if her evidence is believed, does not give rise to a claim for retaliation. The alleged "unsubstantiated oral reprimands" and "unnecessary derogatory comments" suffered by Robinson

20

following her complaint do not rise to the level of what our cases have described as "adverse employment action."

Title VII declares that "[i]t shall be an unlawful employment practice for an employer to discriminate" against an employee "because he has made a charge" of discrimination. 42 U.S.C. § 2000e-3(a). Title 42 U.S.C. § 2000e-2(a) makes it an "unlawful employment practice"

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . or to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . .

Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," deprives him or her of "employment opportunities," or "adversely affect[s] his [or her] status as an employee." It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for"[o]therwise, minor and even trivial employment actions that `an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' " Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996) (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)).

Courts have operationalized the principle that retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment into the doctrinal requirement that the alleged retaliation constitute "adverse employment action." See Williams, 85 F.3d at 273 (interpreting parallel provisions of the Age Discrimination in Employment Act to require "materially adverse action"); McDonnell v. Cisneros, 84 F.3d 256, 258 (7th Cir. 1996) ("The language of `materially adverse employment action' that some courts employ in retaliation cases is a paraphrase of Title VII's basic

21

prohibition against employment discrimination, found in 42 U.S.C. §§ 2000e-2(a)(1) and (2)."). Accordingly, just as we concluded that a quid pro quo plaintiff must show a "quo" that is serious enough to alter his or her "compensation, terms, conditions, or privileges" of employment, we hold that the "adverse employment action" element of a retaliation plaintiff's prima facie case incorporates the same requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e-2(a)(1) or (2).15

_____

15. In Nelson v. Upsala College, 51 F.3d 383 (3d Cir. 1995), the plaintiff, a former employee of Upsala, contended that Upsala retaliated against her by requiring that she obtain prior approval before going onto Upsala's campus. We observed that 42 U.S.C. § 2000e-3(a) "interdicts `an unlawful employment practice' rather than conduct in general which the former employee finds objectionable," id. at 388, and rejected the plaintiff's argument on the ground that the allegedly retaliatory action "had no impact on any employment relationship that Nelson had, or might have in the future." Id. at 389. In Charlton v. Paramus Bd. of Education, 25 F.3d 194 (3d Cir. 1994), we held that a former employee could state a claim for retaliation arising out of post-employment conduct, so long as the retaliation affected the plaintiff's future employment opportunities. Id. at 200-01. We noted that retaliation claims have been permitted "where the retaliation results in discharge from a later job, a refusal to hire the plaintiff, or other professional or occupational harm." Id. at 200.

Although the instant case does not require us to resolve the issue, it appears from our decisions in Nelson and Charlton that a plaintiff who claims that the alleged retaliation prejudiced his or her ability to obtain or keep future employment would meet the standard we announce today by showing that the retaliatory conduct was related to his or her future employment and was serious enough to materially alter his or her future employment prospects or conditions. See, e.g., Smith v. St. Louis University, 109 F.3d 1261, 1266 (8th Cir. 1997) (negative references causing potential employers to decline to hire plaintiff constitute actionable retaliation); Ruedlinger v. Jarrett , 106 F.3d 212, 214 (7th Cir. 1997) (providing information to subsequent employer that caused it to fire plaintiff constitutes retaliation that "impinge[s] on her `future employment prospects or otherwise ha[s] a nexus to employment' ") (quoting Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 891 (7th Cir. 1996)); Passer v. American Chemical Society, 935 F.2d 322, 331 (D.C. Cir. 1991) (under parallel provision of the ADEA, holding that defendant's retaliatory cancellation of a seminar planned in honor of plaintiff gave rise to retaliation claim because the cancellation humiliated

22

We hold that Robinson's allegations that she was subjected to "unsubstantiated oral reprimands" and "unnecessary derogatory comments" following her complaint do not rise to the level of the "adverse employment action" required for a retaliation claim. See Wanamaker v. Columbia Rope Co., 108 F.3d 462, 465-66 (2d Cir. 1997) ("barring a terminated employee from using an office and phone to conduct a job hunt presents only a minor, ministerial stumbling block toward securing future employment" and thus did not constitute adverse employment action under parallel provisions of the ADEA); Veprinsky, 87 F.3d at 895 (former employer's subsidizing of attorney for an individual sued by plaintiff was "entirely unrelated to employment" and resulted in "too intangible" adversity to plaintiff and thus could not give rise to a retaliation claim); Williams, 85 F.3d at 274 (lateral transfer involving small indirect effect on employee's earnings from commissions "cannot rise to the level of a materially adverse employment action"). See also McDonnell, 84 F.3d at 258 (implying in dicta that "anger, irritation, dirty looks, even the silent treatment can cause distress" but do not constitute materially adverse employment action); Harley v. McCoach, 928 F. Supp. 533, 541-42 (E.D. Pa. 1996).

B. In addition, much of what Robinson characterizes as retaliation for her EEOC complaint is in fact alleged to have occurred before she filed the complaint. What Dickerson may have done after Robinson "refut[ed] one of his advances" might constitute evidence of a hostile work environment or of quid pro quo harassment, but since it happened before Robinson filed her complaint, Robinson cannot establish a causal connection between her complaint and the conduct. What remains of Robinson's evidence is essentially as follows: (1) that a co-worker named Mona Wallace retaliated against Robinson by restricting her computer access during the summer of 1994

_____

plaintiff in the eyes of his peers "and made it more difficult for him to procure future employment"); Sherman v. Burke Contracting, Inc., 891 F.2d 1527, 1532 (11th Cir. 1990) (retaliation claim proper where plaintiff's former employer persuaded plaintiff's new employer to fire him).

23

to weekdays, in contrast to Robinson's previously unrestricted access; and (2) that the "ten-car memo" written by Edwards and sent to Bochter, Dickerson, and Buford was a retaliatory attempt to force Robinson to return to working under the direct supervision of Dickerson, her alleged harasser. Assuming arguendo that Wallace's conduct and Edwards's memo constitute "adverse employment action," we do not believe that Robinson demonstrated the required "causal link" between her complaint and either Wallace's conduct or Edwards's memo. Aman, 88 F.3d at 198.

Robinson testified that one Saturday during the summer of 1994, she attempted to work on her computer but was unable to do so because her authorization had been restricted to weekdays. (App. 240) Before that time, Robinson had had unrestricted computer access. (App. 240) Wallace, who was a co-worker of Robinson's, is not implicated in any way in any of the alleged sexual harassment. Robinson points to no evidence that anyone other than Wallace was involved in the decision to restrict her computer access, and she offers no evidence of any sort to show that Wallace took this action in retaliation for Robinson's complaint. On the contrary, Robinson relies merely on a post hoc, ergo propter hoc inference from the fact that the restriction was imposed after Robinsonfiled her complaint.

Our cases are seemingly split on the question whether the timing of the allegedly retaliatory conduct can, by itself, support a finding of causation. Compare Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (plaintiff "demonstrated the causal link . . . by the circumstance that the discharge followed rapidly, only two days later, upon Avdel's receipt of notice of [his] EEOC claim") with Delli Santi v. CNA Ins. Co., 88 F.3d 192, 199 n.10 (3d Cir. 1996) ("timing alone will not suffice to prove retaliatory motive"). In Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997), relying on Jalil, we stated in dicta that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." On the other hand, in Quiroga v. Hasbro, Inc., 934 F.2d 497 (3d Cir. 1991), we characterized our statement in Jalil that the

24

"timing of the discharge in relation to Jalil's EEOC complaint may suggest discriminatory motives" as the holding of that case, and stated that in Jalil "we stopped short of creating an inference based upon timing alone." Id. at 501 (emphasis added).

We believe that, if Jalil is to be interpreted as holding that timing alone can be sufficient, that holding must be confined to the unusually suggestive facts of Jalil. Thus, even if timing alone can prove causation where the discharge follows only two days after the complaint, the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events. See Quiroga, 934 F.2d at 501 (holding that, "[a]s a matter of fact," the timing of Quiroga's alleged constructive discharge was not independently sufficient to prove it was caused by his complaint). There is no evidence that Wallace's restriction of Robinson's computer access followed immediately upon her complaint, so this is thus not one of the extraordinary cases where the plaintiff can demonstrate causation simply by pointing to the timing of the allegedly retaliatory action. Accordingly, we reject Robinson's claim that Wallace's action constituted unlawful retaliation.16

_____

16. Because Robinson has failed to present evidence of a causal connection between her complaint and Wallace's conduct, Robinson has not made out a prima facie case that Wallace's conduct constituted retaliation. See, e.g., Aman, 85 F.3d at 1085. Defendants therefore were not required to proffer a legitimate, non-discriminatory reason for Wallace's conduct. However, they did so, presenting evidence that Wallace restricted Robinson's access because Robinson had been committing security breaches (for example, by bringing files home) and that Wallace took this action entirely on her own. (App. 562-66, 579) If defendants were obligated to proffer such an explanation, Robinson would then have the burden of presenting evidence from which a reasonable jury could conclude either that "the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer." Delli Santi, 88 F.3d at 199. Robinson has not pointed to any implausibilities, inconsistencies, contradictions, incoherencies, or the like in Wallace's testimony, see Sheridan, 100 F.3d at 1072, and has not even attempted to explain why the jury should

25

A similar analysis applies to the "ten-car memo" written by Edwards in June 1994. Before that time, Robinson had been assigned to the "ten-car" (a drug suppression vehicle) but had been detailed to criminal intelligence where she worked under Bochter. Dickerson was in charge of the ten-car but had no supervisory authority over the criminal intelligence unit. The ten-car memo states that "due to the increased activity in the downtown area and with the ending of the school year, the need for the extra assistance that the ten car provides has increased. Due to these facts, effective immediately, all personnel assigned to a ten car is [sic] to be immediately informed that they will ride the vehicle that they are assigned to." (App. 237)

Robinson seeks to portray this memo as a pretextual attempt to force her to work under Dickerson after having filed a complaint against him. However, it is undisputed that the memo was not applied to Robinson; she remained in the criminal intelligence unit from June 1994 (when the memo was circulated) until October 1994, when she stopped reporting for work. (App. 239-40, 249-50) Again, Robinson attempts to link the ten-car memo to her complaint simply by pointing to the temporal sequence of the two events, but in light of the circumstances noted above, this is insufficient. There is consequently no basis for a finding that the ten-car memo constituted retaliation against Robinson for her complaint of discrimination.

Robinson's final argument is that the jury would have been entitled to return a verdict for her on her retaliation claim if it had agreed that she was subjected to a hostile work environment. She relies on our statement in Aman that "an atmosphere of condoned sexual harassment in the workplace increases the likelihood of retaliation for complaints in individual cases," 85 F.3d at 1086, but that

_____

disbelieve Wallace. Nor does the record itself suggest any such reason. Rather than showing that Wallace was in league with Dickerson or management generally, the record in fact reveals that Wallace accompanied Robinson to the EEOC as "moral support" when Robinson filed her complaint. (App. 560) We therefore hold, in the alternative, that Robinson failed to present evidence undermining defendants' proffered legitimate, non-discriminatory explanation for the challenged conduct.

26

statement is merely an empirical prediction; it is not a legal theory that obviates the presentation of actual evidence of retaliation. In Hawkins v. Hennepin Technical Center, 900 F.2d 153, 156 (8th Cir. 1990), the source of the cited statement from Aman, the court held that the plaintiff should have been allowed to present evidence of the defendant's prior acts of sexual harassment, even if those acts were not independently actionable, in order to cast doubt upon the credibility of the defendant's proffered legitimate, non-discriminatory explanation for the allegedly retaliatory conduct. Id. at 155-56. In Hawkins, the plaintiff had enough evidence of retaliation to get to the jury even without the evidence of "condoned sexual harassment," so the court's decision cannot be read as upholding the argument that Robinson urges upon us here.17

---

17. In Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994), we quoted the Eighth Circuit's statement in Hawkins with approval in support of the proposition that evidence that Glass had been subjected to racial harassment during a time period for which he received an unfavorable performance rating was relevant to show that that rating was of questionable validity and thus that the employer's reliance on that rating in denying Glass certain promotions was pretextual. Therefore, like Hawkins itself, Glass  does not support the view that evidence that the employer condoned sexual harassment suffices to prove the element of the employee's prima facie case requiring a causal link between his or her complaint and a subsequent adverse employment action.

In Woodson, we stated that evidence that the employer condoned a harasser's conduct can contribute to an inference that subsequent adverse employment action taken by the harasser against the plaintiff was causally linked to the plaintiff's complaint about the harassment. 109 F.3d at 922. This observation rests upon the recognition that, if the harasser got away with the harassment, it is more likely that he or she will believe that retaliation will be safe as well, and conversely, if the employer took prompt and adequate action against the harasser, the harasser will be less confident of his or her ability to engage in retaliation with impunity. In this case, however, Robinson does not contend that Dickerson -- the alleged harasser-- took any retaliatory action against her.

In any event, we made it clear in Woodson that this sort of evidence was not independently sufficient to support an inference of causation. See id. at 921. Whereas Woodson presented other extensive evidence, Robinson seeks to rely solely on evidence that Dickerson subjected her

27

In light of the foregoing, we affirm the district court's grant of judgment as a matter of law to defendants on Robinson's Title VII and § 1983 retaliation claims.18

VI.

Jury Instruction on Employer Liability

The district court denied the City's motion for judgment as a matter of law as to Robinson's claim under Title VII for a hostile work environment, and the jury returned a verdict for the City. Robinson contends that this verdict must be upset because the court erred in its instruction to the jury on the issue of employer respondeat superior liability under Title VII for hostile environment sexual harassment.19 As we

_____

to a hostile work environment and that the City failed to take prompt and adequate action to remedy the harassment. If we were to uphold Robinson's argument, every employee who succeeds on a hostile environment claim would be able to prove a causal link between his or her complaint of harassment and any subsequent adverse employment action. We do not believe that actual proof of retaliatory motive can be dispensed with so easily.

18. In addition to the grounds described in the text, which apply equally to Robinson's Title VII retaliation claim and her§ 1983 retaliation claim, we hold that judgment as a matter of law was properly granted in favor of Edwards and Buford on Robinson's § 1983 retaliation claim on the ground that neither Edwards nor Buford was personally involved in any retaliation. See Part III, supra. We also affirm the grant of judgment as a matter of law to the City on the § 1983 retaliation claim on the additional ground that there was no evidence of a municipal policy or custom encouraging or permitting retaliation. See Part III.C, supra.

19. In order to prevail on a claim under Title VII for a hostile work environment based on sex, an employee must prove that: "(1) he or she suffered intentional discrimination because of his or her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) respondeat superior liability existed." Knabe v. The Boury Corp., ___ F.3d ____, ____, 1997 WL 282905, *3 (3d Cir.)(citing Andrews, 895 F.2d at 1482). It is undisputed on appeal that Robinson presented sufficient evidence of all five elements to create a jury question.

28

noted in Bouton v. BMW of N. Am., Inc., 29 F.3d 103 (3d Cir. 1994), the Supreme Court "has instructed courts to use agency principles when deciding employer liability for sexually hostile work environments." Id. at 106 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 72 (1986)). We explained that:

The Restatement (Second) of Agency § 219 provides three potential bases for holding employers liable for sexual harassment perpetrated by their employees. Section 219(1) holds employers responsible for torts committed by their employees within the scope of their employment. . . . [In addition,] [u]nder§ 219(2)(b), masters are liable for their own negligence or recklessness; in a harassment case, this is typically negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment. Finally, under § 219(2)(d), if the servant relied upon apparent authority or was aided by the agency relationship, the master is required to answer.

Id. In the instant case, Robinson contended that the City should be held liable for Dickerson's alleged harassment on the theory that the City had notice of the harassment yet failed to take remedial action to put a stop to it. See Knabe v. The Boury Corp., ___ F.3d ___, ___, 1997 WL 282905, *4 (3d Cir.) (same).

The court charged the jury as follows:

To prove the fifth element [respondeat superior liability on the part of the City], wife-plaintiff must prove that the City of Pittsburgh was negligent insofar as its procedure for handling sexual harassment complaints was not effective. It is important for you, the jury, to understand that the City of Pittsburgh may only be held liable for the existence of a sexually hostile working environment that results from its own negligence. The City may not be held liable simply because one of its employees engaged in sexual harassment.

Thus, if the City of Pittsburgh had an effective procedure for handling sexual harassment complaints at the time of the alleged incidents, the City was not

29

negligent and it cannot be held liable for the improper conduct of its employees.

> In order to determine whether the City of Pittsburgh was negligent in this case, you must decide whether its sexual harassment procedure was effective. A sexual harassment procedure is effective if it is both known to the victim of sexual harassment and its [sic] use of the procedure timely stops the harassment.

(App. 1331-32). Robinson timely objected to this charge (App. 1310-11, 1314-15), arguing that "I think we've shown evidence where there was not an effective procedure.. . . [U]nder the facts of this case you can't presume there was an effective procedure, because the procedure required Chief Edwards to take action, and he didn't." The court responded that it was not, in fact, "presuming" that the City had an effective anti-harassment procedure, and stated that "[i]t's the jury's job to decide whether it was effective or not." (App. 1311) We exercise plenary review over the jury instructions in order to determine whether, read as a whole, they stated the correct legal standard. Miller v. CIGNA Corp., 47 F.3d 586, 591 (3d Cir. 1995) (en banc).

In Bouton, the case upon which the district court relied in its jury charge, we held that "under negligence principles, prompt and effective action by the employer will relieve it of liability." Bouton, 29 F.3d at 107 (emphasis added). Robinson argues that the charge based on Bouton was inappropriate because the complaint in that case did end the harassment, while her complaint did not. According to Robinson, the court should have based its jury instruction on Andrews, a case where the complaint did not put a stop to the harassment. Robinson's argument is nothing more than a contention that the City's action in this case was not "effective." But whether Robinson's complaint put a stop to the harassment -- and whether any harassment occurred in the first place -- were factual issues committed to the jury. The basic problem with Robinson's argument is that it challenges the jury's verdict, not the court's charge.

Robinson contends that, even if the City put an end to the harassment by transferring Dickerson following her

30

May 1994 complaint, the City should have taken such action in 1992 when she first spoke to Edwards about Dickerson's "hitting on her." But Robinson argued at trial that her 1992 conversation with Edwards constituted an attempt to avail herself of the City's anti-harassment procedure, and that the City failed to respond adequately to her complaint. (App. 1405) If the jury had believed that the 1992 conversation had taken place and that Robinson had made it sufficiently clear to Edwards that she was complaining about conduct that she perceived as sexual harassment, the jury could have held the City liable. That it did not do so is not a basis to attack the charge. Robinson's argument, both as quoted above in her objection to the charge in the district court and on appeal, runs more like an argument in favor of judgment as a matter of law that the City did not take adequate remedial action once it learned of the harassment than a challenge to a jury instruction. Robinson did not move for such a judgment, however, and it is plain that no such judgment would have been warranted in view of the evidentiary disputes regarding whether the harassment occurred and when the City found out about it. As the district court put it, "it's the jury's job to decide whether [the City's anti-harassment procedure] was effective or not." We reject Robinson's argument that the Bouton charge was inappropriate on the facts of her case, because it was for the jury in its verdict, not the court in its charge, to decide what the facts of this case were.20

---

20. After the trial in this case, we decided Knabe v. The Boury Corp., ___ F.3d ____, 1997 Wl 282905 (3d Cir.). As noted above, in Bouton we articulated the standard as whether the employer's remedial action was "effective." See 29 F.3d at 107. In Andrews, we phrased the standard somewhat differently, stating that the employer will be liable if its remedial action was not "adequate." See 895 F.2d at 1486. If there was any conflict between the "adequacy" standard expressed in Andrews and the "effectiveness" standard set forth in Bouton, Knabe has resolved it. In Knabe, we rejected the plaintiff's argument that an employer is liable unless it took remedial action that was actually "effective" to put a stop to the harassment in the particular case at hand. We held instead that a remedial action is "adequate" if it was "reasonably calculated to prevent further harassment," whether or not it actually succeeded in doing so. Id. at __, *5 (citations omitted). See also id. at __, *4 n.8. Therefore, the charge in this case arguably misled the jury into believing that the City's response had to be actually effective. Of course, in view of the jury's verdict for the City, no prejudice flowed from this possible error.

31

VII.

After the district court granted defendants' motion for judgment as a matter of law on Robinson's quid pro quo harassment and retaliation claims, defendants' counsel asked the court to remove from the record certain exhibits that "were offered with relation to those claims." (App. 1307). The court then went through the exhibits in question with counsel and excluded all but two of them. (App. 1308-13) Later, in charging the jury, the court listed the claims that it had "disposed of" and told the jury that "these claims are of no concern to you. The evidence you heard concerning these claims is no longer relevant and should not be considered by you." (App. 1326) On appeal, Robinson argues that these evidentiary rulings and this statement were erroneous because evidence of quid pro quo harassment and retaliation, even if it does not concern conduct that is serious enough to be independently actionable on a quid pro quo or a retaliation theory, may nevertheless be relevant to show a hostile work environment. These errors, she submits, require reversal of the jury's verdict in favor of the City on her Title VII hostile environment claim.

We need not consider this argument, because we do not believe that Robinson raised it in the district court. Fed. R. Civ. P. 46 requires "that a party, at the time the ruling or order of the court is made or sought, make[ ] known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor." We conclude that, while Robinson may have made a timely objection to the evidentiary exclusions that she contests, she at no time made known to the district court the ground that she now presses in this court.

As noted, the court analyzed each exhibit that defendants sought to exclude. For most of the exhibits mentioned during that process, plaintiffs' counsel voiced no objection, and neither of the two objections that he did raise related to the argument described above upon which Robinson now relies. First, plaintiffs' counsel objected to the exclusion of exhibit 57-X, arguing that it was relevant to undermine the credibility of a witness named Gail Payne by showing "her

32

motive in giving testimony the way she did and what she said." (App. 1308) The court disagreed, and removed the exhibit from the record. Next, counsel argued that exhibit 78 was relevant to show that the City's response to Robinson's complaint of harassment was ineffective. (App. 1310) The court disagreed, stating that the exhibit only "has to do with retaliation." (App. 1311) Robinson does not renew either of these objections on appeal. After the court and counsel had gone through all of the exhibits at issue, plaintiffs' counsel stated that "[t]o make the record clear, Your Honor, I would just like to for the record, to formally object to the Court's ruling based on the Bouton case and the evidentiary rulings you just made." (App. 1315) Counsel offered no further explanation of the grounds for this objection.

Subsequently, in charging the jury, the court made the statement quoted above that Robinson now challenges. After completing the jury charge, the court told counsel at sidebar that "[n]ow is your opportunity to put exceptions to the charge on record." (App. 1348) Plaintiffs' counsel did not mention the challenged statement, and did not otherwise make known the argument that Robinson now makes on appeal.

We therefore conclude that plaintiffs' counsel never gave the district court any reason to believe that he was making the argument that evidence of quid pro quo harassment and retaliation, even if not actionable on those theories, was nevertheless relevant to show a hostile work environment. Because Robinson did not raise that argument in the district court, we decline to consider it on appeal.21

---

21. Robinson argues that the court erred in refusing to allow her to present evidence that the City transferred officers to the detective bureau on the basis of nepotism and favoritism, in violation of its written policies. We find no error in the district court's ruling that the proffered evidence could not give rise to a reasonable inference of discrimination because of sex. Finally, Robinson challenges the court's refusal to admit the report prepared by the City's Office of Professional Responsibility that found that Dickerson had created an "uncomfortable" work environment for another woman. The court allowed Robinson to elicit the

33

VIII.

For the reasons stated in this opinion, we affirm the district court's grant of defendants' motion for judgment as a matter of law with respect to Robinson's claims under § 1983 against Buford, Edwards, and the City for sex discrimination and retaliation and Robinson's claim under Title VII against the City for retaliation. We reverse the grant of judgment as a matter of law with respect to Robinson's claim under Title VII for quid pro quo sexual harassment against the City and remand for trial of that claim. On remand, the district court should ascertain whether Robinson seeks to pursue a claim under § 1983 for quid pro quo harassment against Dickerson, and if so, whether she should be permitted to do so in light of the prior proceedings in this case. See n.14, supra. In all other respects, we affirm the district court's rulings and its entry of judgment upon the jury's verdict.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

report's conclusions as admissions by the City, but excluded the report itself as irrelevant. Robinson contends that the report shows notice to the City of Dickerson's alleged harassment of her. We find no error here as well. The conduct on the part of Dickerson discussed in the report is not his alleged harassment of Robinson, so the report in no way put the City on notice that Dickerson was harassing Robinson.