**Joel J. SABBRESE, Plaintiff,**

v.

**LOWE'S HOME CENTERS, INC., Defendant.**

Civil Action No. 02–2010.

United States District Court, W.D. Pennsylvania.

June 9, 2004.

Gregory T. Kunkel, Kunkel & Fink, Pittsburgh, PA, for Plaintiff.

Mark T. Phillis, Littler Mendelson, Pittsburgh, PA, for Defendant.

## MEMORANDUM ORDER

CONTI, District Judge.

Pending before this court are cross-motions for summary judgment filed by defendant Lowe's Home Centers, Inc. ("Lowe's" or "defendant") (Doc. No. 30) and plaintiff Joel J. Sabbrese ("Sabbrese" or "plaintiff") (Doc. No. 33). Also pending is defendant's motion to strike plaintiff's request for compensatory and punitive damages and demand for a jury trial under the Americans With Disabilities Act, 42 U.S.C. §§ 12101, et. seq. ("ADA") (Doc. No. 32). After a hearing on the motions and consideration of the arguments of counsel and the submissions of the parties, the court will (1) grant defendant's motion for summary judgment in part and deny defendant's motion in part; (2) deny plaintiff's motion for partial summary judg-

ment; and (3) grant defendant's motion to strike plaintiff's request for compensatory and punitive damages and demand for a jury trial under the ADA.

### Background

Plaintiff began his employment with defendant at defendant's Uniontown, Pennsylvania store in 1994. Joint Stipulation of Undisputed Material Facts (hereinafter "Jt. Stip.") ¶¶ 1–2. Initially hired as a customer service associate, plaintiff was promoted to appliance sales specialist in 1999. *Id.* ¶ 2.[1] In November and December 2000, Sabbrese began experiencing unexplained weight loss. *Id.* ¶ 3.[2] His family physician, Dr. Isariyawongs Prakorb, diagnosed Sabbrese with diabetes in January 2001. *Id.* Dr. Prakorb prescribed Sabbrese the drug Glucophage to help him control his blood sugar and the drug Zosteril to help control his blood pressure. *Id.*

Sabbrese notified Lowe's management of his condition shortly after he was diagnosed by Dr. Prakorb. *Id.* ¶ 5. His condition presented him with certain limitations. For example, Sabbrese was required to eat on a scheduled basis of intervals in order to control his blood sugar. *Id.* Ex. 4, at 53. Sabbrese also initially had vision problems that prevented him from driving at night, and he presented Marie Rozik, the Lowe's employee responsible for maintaining personnel files, with a doctor's excuse from Dr. Prakorb to have his schedule changed to the day shift. *Id.* Ex. 4, at 54. For the next few months, Sabbrese worked the day shift, until his vision improved to the extent that he could again drive at night. *Id.*, Ex. 4, at 62–63. Mike

---

1. Sabbrese worked 42 to 48 hours per week, and he worked at least 1,250 hours during the last twelve months of his employment. *Id.*

2. The Jt. Stip. states that Sabbrese experienced his unexplained weight loss in November 2001 and was then diagnosed with diabetes in January 2001. This sequence of events

is, of course, not possible because plaintiff's weight loss precipitated his diagnosis. Even the deposition passage cited by counsel in the Jt. Stip., the deposition of plaintiff, fixes the date that plaintiff's weight loss began occurring in late 2000. *See* App. to Jt. Stip., Sabbrese Dep. at 46.

Smitley, who was Sabbrese's immediate supervisor in his capacity as department manager for the appliance department, was aware that Sabbrese was diabetic, as was assistant manager Jon Baugh, who was in charge of scheduling for the department. *Id.* Ex. 4, at 54, 66. In fact, Sabbrese estimates that at least 50 percent of his coworkers, including Donald (D.J.) Williams, the store manager, were aware that he had diabetes. *Id.* Ex. 4, at 54.

Sabbrese's condition requires him to test his blood sugar up to four times daily: in the morning, before and after lunch, and before he goes to bed. *Id.* ¶ 4. While employed at Lowe's, Sabbrese ensured that he was discrete about testing his blood at work in order not to offend any fellow co-workers or customers. *Id.* Sabbrese utilized a combination of medication, exercise, and a diet in order to control his blood sugar. *Id.* In situations where his blood sugar fluctuated outside acceptable levels, Sabbrese became faint and nauseated, and he was required to take corrective action by eating in order to control his blood sugar levels. *Id.* Lowe's management was aware of Sabbrese's situation and attempted to accommodate his eating needs. In fact, Mike Smitley, the department manager, permitted Sabbrese to snack on crackers during his work time because of his diabetes. Def.'s Statement of Material Facts ("Def.State.") ¶ 4; Pl.'s Statement of Material Facts ("Pl.State.") ¶ 11.

On the morning of November 8, 2001, Sabbrese began work at 10:00 a.m. *Id.* ¶ 6.

Sabbrese was scheduled to work with William Grayson, who was also an appliance sales specialist in the same department. *Id.* It was the practice of employees at the Uniontown Lowe's to coordinate their break schedules in order to ensure that the department was covered throughout the work day. Pl. State. ¶ 13. Thus, on November 8, 2001, Grayson and Sabbrese agreed that Grayson would take his lunch break first, between 1:00 p.m. and 2:00 p.m., and that Sabbrese would be able to go to lunch between 2:00 p.m. and 3:00 p.m. *Id.*[3] At around 12:30 p.m., Sabbrese ate some crackers in order to keep his blood sugar at a comfortable level until he was scheduled to go to lunch. *Id.* ¶ 6. Grayson went to lunch sometime before 2:00 p.m. An hour came and went without Grayson's return. *Id.* Between 3:20 p.m. and 3:30 p.m., Sabbrese began feeling faint; he sat down at the paint desk in the store in order to test his sugar. *Id.* His blood sugar level was approximately 70 to 71, and he felt weak, nauseated and lightheaded. Pl. State. ¶ 17. Believing that he was going to pass out if he waited any longer to eat, Sabbrese decided to go to lunch with two other Lowe's employees. Jt. Stip. ¶ 8.

Lowe's does not have a written policy requiring employees to notify supervisors that they are taking a break. Pl. State. ¶ 12. Lowe's, however, contends it has a general policy that employees must notify a supervisor prior to leaving their department unattended. Def. State. ¶ 15.[4]

---

**3.** Under Lowe's company policy, employees scheduled to work five hours or more in a day are entitled to a lunch break of up to one hour and are given a fifteen-minute break for each four hours of uninterrupted work. Def. State. ¶ 5; Pl. State. ¶ 12. Thus, an employee scheduled to work a normal eight-hour work day is entitled to two fifteen-minute breaks and a one-hour lunch break. *Id.*

**4.** Lowe's interprets the following example of a "Class C" violation in its Human Resources Management Guide as stating this policy:

\* \* \* \*

8. Failure to notify and receive permission from supervisor before leaving assigned work area during working time *with the exception of prearranged breaks and lunch periods.*

Lowe's also claims to have an unwritten practice that an employee leaving a department unattended is required to notify the manager on duty, the employee's department manager, or another assistant manager before passing the department portable telephone off to an employee in another department. Def. State. ¶ 7. The record, however, reflects a material issue of fact on this point, as two Lowe's employees, Grayson and Carl Salipek, testified in their depositions that employees only notified management when they were unable to find anyone to cover their department. Pl. State. ¶ 15. Nevertheless, Sabbrese paged Grayson and Smitley in an attempt to inform them that he needed to leave for lunch. Jt. Stip. ¶ 8. When he was unable to reach either of them, Sabbrese went to the adjacent flooring department and asked flooring department manager Steve Lemro if Lemro could watch the appliance department so that Sabbrese could go to lunch. *Id.* Sabbrese told Lemro that Grayson was late returning from lunch and that he expected him back any minute. *Id.* Lemro agreed to cover the appliance department and accepted the department telephone. *Id.* Sabbrese left for lunch and, ironically, on the way outside of the store he saw Grayson walking back into the store and waved to him. *Id.*[5]

Lemro was able to find appliance department manager Smitley and hand him the appliance department telephone. Def. State. ¶ 11; Pl. State. ¶ 20. At that time, Smitley was speaking with assistant store manager Baugh. *Id.* When Baugh asked Smitley where his appliance sales specialists were, Smitley answered that it appeared both went to lunch leaving the department unattended without notifying him. *Id.* Because Sabbrese left without ensuring adequate coverage in the appliance department, Baugh instructed Smitley to write a verbal warning to Sabbrese for leaving the department unattended. *Id.*[6] Lowe's Policy Number 315—Performance Management/Commendation and Corrective Action ("Policy 315")—sets forth the standards of conduct for Lowe's employees and guidelines for corrective action to be taken in certain situations. Jt. Stip. ¶ 11. A verbal warning is considered a "Class C" violation in Lowe's progressive discipline plan, and such violations usually result in an "initial or written warning for a first offense." Jt. Stip. ¶ 12. The list of Class C violations includes the following, upon which Sabbrese was disciplined: "Failure to notify and receive permission from supervisor before leaving assigned work area during working time with the exception of prearranged breaks and lunch periods." Jt. Stip. ¶ 13; Rozik Ex. 8; *see* note 5, *supra.* The verbal warning signed by Smitley and Baugh was finalized prior to Sabbrese's return from lunch and with-

Def. State. Ex. 8, at 4 (emphasis added). Sabbrese agrees that this was the general practice of employees in the Uniontown store, but he states that the practice of coordinating breaks was based upon "common sense" rather than any established policy. *Id*, Ex. 6, at 91–93.

5. Lowe's time records show that Sabbrese punched out for lunch at 3:51 p.m. and that Grayson returned from lunch at 3:53 p.m. Pl. State. Ex. J, at Dep. Ex. 6.

6. The deposition testimony of Baugh and Smitley differ as to which of the two wanted to punish Sabbrese for his actions. Smitley testified in his deposition that Baugh was upset and ordered Smitley to write a verbal warning to Sabbrese. Smitley Dep., at 23–24. In contrast, Baugh testified that Smitley was upset with Sabbrese and wanted to take some action against him, and that Baugh suggested Smitley write up a verbal warning to give to Sabbrese. Baugh Dep., at 9–12. Baugh contends that Smitley prepared the verbal warning, which Baugh signed just prior to leaving the store for the day at the end of his shift. *Id.*

out either Baugh or Smitley asking Sabbrese why he left for lunch when he did. Def. State. ¶ 24; Pl. State. ¶ 22.

When Sabbrese returned from lunch, he was summoned to meet with Smitley and assistant manager Gary Dixon in the zone office. Jt. Stip. ¶ 14. At that meeting, Smitley issued the verbal warning to Sabbrese for leaving the appliance department unattended while Grayson was still at lunch. Def. State. ¶ 27; Pl. State. ¶ 23. Sabbrese protested the verbal warning and stated he had to leave the store to eat because he was feeling faint and needed to eat in order to control his blood sugar levels. Def. State. ¶ 28; Pl. State. ¶ 223. Furthermore, Sabbrese stated that he did not violate company policy because he handed off the department telephone to Steve Lemro. Pl. State. ¶ 24.

What happened next at the meeting is a matter in dispute between the parties. As Sabbrese was leaving the zone office, there was physical contact between Sabbrese and Smitley. Sabbrese refers to the contact as "incidental." Pl. State. ¶ 25. He contends that, as he was leaving the room, Smitley quickly got up from his seat and blocked the door in a manner that Sabbrese thought was threatening. Id. Sabbrese states that Smitley came to within one foot of Sabbrese, that this startled him, and that he put up his hands in front of him and made incidental contact with Smitley's chest and stepped back. Id. Sabbrese characterizes the contact as his reaction to being threatened by Smitley. Id. On the other hand, Lowe's contends that Sabbrese pushed away from Smitley after Smitley got close to him, and points out as evidence the affidavit signed by Sabbrese in connection with the filing of his EEOC charge, in which Sabbrese stated: "I pushed him out of my way and

returned to my floor." Def. State. ¶ 32–33. After this event, Smitley and Dixon claim that they ordered Sabbrese to punch out and go home for the day. Def. State. ¶ 36; Pl. State. ¶ 27. Sabbrese, however, was permitted to complete his shift and reported to work as he normally would the following day. Jt. Stip. ¶ 14.

On November 9, 2001, Sabbrese complained to store manager Williams about the disciplinary meeting among Smitley, Dixon and him. Jt. Stip. ¶ 15. This was the first time Williams became aware of the situation. Def. State. ¶ 40. Sabbrese told Williams that he was being discriminated against because of his disability and that he was concerned he could be disciplined again and possibly terminated unless Williams did something about it. Jt. Stip. ¶ 18. Williams informed Sabbrese that the incident was over and that nothing further needed to be done. Id. Sabbrese also made Williams aware of the incidental contact between Smitley and himself. Id. ¶ 17.[7] After speaking with Sabbrese, Williams undertook his own investigation of the incident. Def. State. ¶ 49. He spoke with both Smitley and Dixon and asked each to prepare a written statement regarding the disciplinary meeting with Sabbrese. Id. ¶ 50–51; Pl. State. ¶ 30. Both prepared separate written statements on November 9, 2001 and submitted them to Williams. Jt. Stip. ¶ 21. Sabbrese was not asked to prepare a written statement. Pl. State. ¶ 37.

Williams next consulted Marie Rozik regarding whether Sabbrese's personnel file revealed any medical documentation stating that he was required to eat at certain times. Pl. State. ¶ 35. Rozik replied that there was nothing in Sabbrese's file regarding the need to eat at certain times;

---

**7.** Although both parties agree upon this point in the joint statement, the parties also note that Williams did not specifically remember

Sabbrese making him aware of the incidental contact when asked about it at his deposition. Jt. Stip. ¶ 18.

however, she also testified in her deposition that she was aware of other diabetics at the Lowe's Uniontown store who had to eat at certain times, and that those employees were not asked to provide medical certifications about their need to eat on a regular schedule because they worked it out within their immediate department. *Id.* In fact, store management did not question Sabbrese's claim that he needed to leave for lunch because of his blood sugar. Def. State. ¶ 54; Dixon Dep. at 46–47; Rozik Dep. at 30; Williams Dep. at 35.[8]

Williams does not recall how long his investigation of the incident took. Pl. State. ¶ 38. He contacted both Kevin Seidle, Lowe's district manager, and Lance Dawson, Lowe's area human resources manager violations regarding the November 8, 2001 incident. Def. State. ¶ 59–61; Pl. State. ¶ 39. Williams contends that Dawson directed him to discharge Sabbrese based upon the information Williams presented to him. Pl. State. ¶ 41; Williams Dep. at 50. Dawson, however, testified at his deposition that he first became aware that Sabbrese was terminated on November 23, 2001, when another employee at Lowe's area corporate office informed him that Sabbrese filed a complaint concerning his termination. Pl. State. ¶ 45; Dawson Dep. at 14. Seidle also denies that he made the decision to terminate Sabbrese, and stated he was unaware who actually made the ultimate determination despite the fact that Lowe's Policy Number 112—Demotion/Termination of Employees ("Policy 112")—required approval of both the store manager and district manager before a salaried employee could be terminated. Jt. Stip. ¶ 22–23; Pl. State. ¶ 43; Seidle Dep. at 21. Seidle was aware, however, of another Lowe's employee at the Uniontown store who was terminated on August 1, 2002 for allegedly threatening another employee on July 29, 2002. Pl. State. ¶ 44.

Despite the confusion over who ultimately made the decision to terminate Sabbrese, there is agreement that Sabbrese was terminated for committing a "Class A" infraction in violation of Policy 315 for making physical contact with Smitley at the November 8, 2001 disciplinary meeting. Specifically, Sabbrese was terminated with respect to the following Class A infraction: "Verbal or physical abuse or other abusive behavior toward employees, customers or other persons on Company property." Jt. Stip. ¶ 19–20. Lowe's considers Class A violations to be extremely serious infractions that normally result in immediate discharge without prior warning. Jt. Stip. ¶ 19. On November 23, 2001, Williams informed Sabbrese that his employment was terminated because he committed a Class A infraction on November 8, 2001. *Id.* ¶ 24.

### *Procedural History*

After obtaining a right to sue letter from the EEOC, Sabbrese brought suit against Lowe's alleging (1) that defendant unlawfully retaliated against him in violation of the ADA; (2) that defendant interfered with the exercise of his rights and unlawfully retaliated against him in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); and (3) that defendant unlawfully retaliated against him in violation of the Pennsylvania Human Relations Act, 43 Pa. Con. Stat.

---

**8.** At the summary judgment hearing, the court asked several times if defendant disputed Sabbrese's explanation that Sabbrese needed to leave in order to eat to control his blood sugar. Defense counsel replied each time that there was not a dispute as to Sab-brese's explanation why he left. The court also asked whether Sabbrese's credibility was at issue with respect to his explanation. Defense counsel responded that plaintiff's credibility was not at issue on that matter. *See Tr.* at 10–13 (Doc. No. 46).

ANN. §§ 951 *et seq.* ("PHRA"). Defendant asserts in its motion for summary judgment that it is entitled to summary judgment on the following three theories: (1) plaintiff cannot state a prima facie case of retaliation under the FMLA because he was not seeking to exercise a right under the FMLA; (2) plaintiff cannot state a prima facie case of retaliation under the FMLA, the ADA, and the PHRA because the warning plaintiff received was not an adverse employment action; and (3) plaintiff cannot state a prima facie case of retaliation under the FMLA, ADA, and/or PHRA because he failed to demonstrate a causal connection between his alleged protected activity and either the warning or his termination. Plaintiff in his cross-motion for partial summary judgment asserts that he is entitled to partial summary judgment on his FMLA interference claim because the Class C disciplinary violation he received from defendant for taking intermittent leave during a medical emergency "discouraged" him from using FMLA leave.

Also pending is defendant's motion to strike plaintiff's request for compensatory and punitive damages and demand for a jury trial under the ADA (Doc. No. 32). Defendant asserts that the plain language of the ADA and the Civil Rights Act of 1991 prohibits plaintiff from recovering compensatory and punitive damages under an ADA retaliation claim. Because defendant claims that only equitable relief may be awarded to plaintiff if he is successful on his ADA retaliation claim, defendant contends that plaintiff is not entitled to a jury trial on his ADA retaliation claim.

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

### Discussion

**I. Cross-motions for summary judgment**

**A. Defendant is entitled to summary judgment on plaintiff's retaliation claims under the FMLA, ADA, and PHRA with respect to the Class C disciplinary warning plaintiff received because that warning, even as part of a progressive discipline scheme, did not constitute an adverse employment action.**

■ Retaliation claims brought under the ADA follow the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Jalil v. Avdel Corporation*, 873 F.2d 701, 706 (3d Cir.1989). Under the first step in this framework, a plaintiff has the initial burden of establishing the following prima facie case: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer took adverse action after or contemporaneous with the employee's protected activity; and (3) a causal

link exists between the employee's protected activity and the employer's adverse action. *Abramson v. Wm. Paterson College of N.J.*, 260 F.3d 265, 286 (3d Cir.2001). Defendant concedes that plaintiff engaged in protected activity with respect to the ADA and PHRA, and, as more fully analyzed below, the court further determines that plaintiff engaged in protected activity under the FMLA. Thus, the issue with respect to this ground for summary judgment is whether the Class C violation constitutes "adverse action" under the second prong of the prima facie case.

The term "adverse action" in this context refers to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Weston v. Commonwealth of Pennsylvania*, 251 F.3d 420 (3d Cir.2001) (*citing Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). "Courts have operationalized the principle that retaliatory conduct must be *serious and tangible enough* to alter an employee's compensation, terms, conditions or privileges of employment into the doctrinal requirement that the alleged retaliation constitute 'adverse employment action.'" *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997) (emphasis added).[9] With respect to this case, Lowe's argues that the written warning was not serious and tangible enough to constitute a significant change in Sabbrese's employment status.

Lowe's relies upon *Weston, supra*, in which the United States Court of Appeals for the Third Circuit court held that a written reprimand placed in an employee's personnel file did not constitute an adverse

employment action. *Weston*, 251 F.3d at 431. The court determined that there was not a material change in the terms or conditions of Weston's employment because "he was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location ..., did not have his hours or work changed or altered in any way, and that he was not denied any pay raise or promotion as a result of these reprimands." *Id.* at 431. Additionally, the court focused on the temporary nature of the written reprimands. Under the collective bargaining agreement in place with Weston's employer, the employer was prohibited from using or making reference to any written reprimand older than six months. *Id.* n. 4. According to the court, "[b]ecause [the reprimands] were not affixed to Weston's employment file, we cannot see how they changed or altered his employment status in any way." *Id.* at 431.

Sabbrese attempts to distinguish *Weston* from the present case because the discipline he received was permanently placed in his personnel file. Sabbrese contends that the written warning placed in his file constituted an adverse employment action because Lowe's employs a progressive discipline scheme whereby repeated Class C violations can lead to termination. It was this threat of future termination, according to Sabbrese, that caused him to complain to Williams. Sabbrese also cites a footnote in *Robinson, supra*, in which the court suggested in *dicta* that an employer's action that materially alters a plaintiff's future employment opportunities constitutes an adverse action for purposes of making out a prima facie case of retaliation. *Robinson*, 120 F.3d at 1301 n. 15.

---

**9.** As the United States Court of Appeals for the Third Circuit noted in *Robinson:*

"[N]ot everything that makes an employee unhappy" qualifies as retaliation, for "[o]therwise, minor and even trivial employment

actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"
120 F.3d at 1300 (citations omitted).

That footnote, however, was written in the context of *post-employment* retaliation that could materially alter future employment opportunities with a subsequent employer, i.e. negative references to potential employers, providing information to a subsequent employer that causes termination of employee, and/or persuading a subsequent employer to terminate employee. *Id.* This case is factually distinct from that situation, as the Class C violation did not have any demonstrable impact upon plaintiff's employment opportunities with a subsequent employer.

■ This court finds that summary judgment is warranted on plaintiff's retaliation claims based upon his November 8, 2001 written reprimand because the reprimand did not effect a material change in the terms or conditions of his employment. There are no allegations in plaintiff's complaint that the written reprimand constituted a change in Sabbrese's title or job description, altered his work schedule, denied him a promotion or pay raise, or precluded him from future employment opportunities. Furthermore, although Policy 315 provides a progressive disciplinary scheme, a second Class C violation does not result in termination, but rather an additional written warning. In fact, even a third Class C violation does not necessarily result in termination, but rather may result in a "final warning." As Policy 315 notes, "the sequence of discipline is not fixed and factors such as length of service and overall work history may be considered." Pl. State. Ex. D. Because of the nature of defendant's disciplinary policy and the fact that plaintiff was not deprived of a significant employment benefit, the court finds that the Class C violation in issue does not constitute an adverse employment action and grants summary judgment in favor of defendant on this ground.

**B. Plaintiff established a prima facie case of retaliation with respect to his termination under the ADA, FMLA, and PHRA, and raised material issues of fact regarding whether defendant's asserted legitimate, non-discriminatory reason for terminating his employment was pretext.**

*1. Plaintiff was seeking to exercise a right under the FMLA.*

Lowe's argues that Sabbrese's claim for retaliation under the FMLA must fail because Sabbrese did not take actual "leave" under the FMLA and thus was not exercising a right under the FMLA. Lowe's contends that Sabbrese misinterpreted the term "intermittent leave" under the FMLA, and that when Sabbrese left for lunch on November 8, 2001 he was leaving for just that—lunch—and not FMLA—protected leave. Lowe's claims that Sabbrese's lunch breaks cannot constitute FMLA leave "because the [lunch] hour spent each day would be deducted from his unused FMLA 'leave,' whereas other employees would not receive such treatment." Def.'s Br. (Doc. No. 31), at 4. This treatment, according to Lowe's, would be contrary to the intent of the FMLA because Sabbrese and other similarly-situated individuals would be vulnerable to employers counting as FMLA leave all lunch breaks and rest breaks taken by diabetic employees. Sabbrese disagrees with this characterization of intermittent leave under the FMLA and asserts that, while he ordinarily has some flexibility to take his lunch break in order to control his blood sugar, when he is experiencing symptoms of hypoglycemia and it is medically necessary for him to eat he is entitled to FMLA-protected intermittent leave. Sabbrese argues that the case at issue is a prime example of why his leave should be protected under the FMLA because he was

unable to wait to follow the proper procedures under Lowe's policy to take his lunch break due to his immediate health concerns.

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(b)(1). The act was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers." 29 U.S.C. §§ 2601(b)(1) and (b)(2). The FMLA grants eligible employees the right to take up to 12 work weeks of leave during a 12 month period for any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(A-D).[10]

An eligible employee that falls under 29 U.S.C. § 2612(a)(1)(C) or (D) may be entitled to take FMLA leave intermittently: on a reduced scheduled when medically necessary. The taking of leave intermittently or on a reduced leave schedule ... shall not result in a reduction in the total amount of leave to which the employee is entitled ... beyond the amount of leave actually taken.

29 U.S.C. § 2612(b). The phrase "intermittent leave" is defined under the implementing regulations as "leave taken in separate periods of time due to a single illness or injury, rather than for one continuous period of time, and may include leave of periods from an hour or more to several weeks." 29 C.F.R. § 825.800.

All FMLA leave, whether intermittent or not, falls into two categories: foreseeable intermittent leave and unforeseeable intermittent leave. The degree of notice required to be given to an employer depends upon whether the leave is foreseeable. If intermittent leave is foreseeable, an employee is required to give the employer 30 days advance notice, or, if 30 days advance notice is impossible under the circumstances, notice must be given as soon as practicable. 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.302. The phrase "as soon as practicable" is defined under the regulations "as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case .... [and] ordinarily would mean at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee." 29 C.F.R. § 825.302(b). If leave is unforeseeable, an employee must give notice to the employer within one or two days of learning of the need for leave, except where extraordinary cases prevent such notice. 29 C.F.R. § 825.303. The regulations with respect to unforeseeable leave further state:

> [i]n the case of a medical emergency requiring leave because of an employee's own serious health condition or to care

---

10. The act defines an "eligible employee" as one who has been employed for at least 12 months by the employer and for at least 1,250 hours during the previous 12 month period.

29 U.S.C. § 2611(A). Both parties agree that Sabbrese is an eligible employee under the FMLA. *See* Jt. Stip. ¶ 2.

for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved. *Id.* Sabbrese contends that the leave taken in this case was unforeseeable. Because no evidence to the contrary was presented by Lowe's, the court will characterize the leave taken by Sabbrese as unforeseeable.

The parties do not dispute that Lowe's was aware of Sabbrese's diabetic condition and that Sabbrese was required to eat on the day in question because his blood sugar dropped below acceptable levels. *See supra.* Neither do the parties dispute that Sabbrese informed department manager Smitley and assistant store manager Dixon that he had to leave the store to eat because his blood sugar was very low and he felt that he might pass out. Def. State. ¶ 28; Pl. State. ¶ 23. *See* 29 C.F.R. § 825.302(b). The dispute centers around whether the leave taken by Sabbrese qualifies as FMLA-protected unforeseeable intermittent leave because the leave also served as Sabbrese's lunch break.

■ After reviewing the statutory language of the FMLA, as well as the implementing regulations, the court finds that leave taken by a diabetic employee in order to eat to correct low blood sugar when medically necessary may qualify as intermittent leave under the FMLA. As noted above, the statute and regulations provide that an employee may take intermittent leave when medically necessary. In this case, there is no dispute that plaintiff was required to eat in order to control his blood sugar. Defendant cites no cases for the proposition that, where it is medically necessary to consume food due to a diabetic or other condition, a lunch break or any other type of break cannot also qualify as intermittent leave. The fact that an employee receives daily lunch and other breaks is not dispositive because there

may be situations, such as the present case, where a diabetic (or otherwise impaired) employee faces a medical emergency and is unable to comply with his employer's break policies, yet still must take unforeseeable intermittent leave. Whether Sabbrese properly complied with Lowe's policies to take leave is an issue of material fact; however, a reasonable finder of fact may determine that, even if Sabbrese violated company policy by leaving before his co-worker returned from lunch, he still qualified for FMLA intermittent leave. Accordingly, defendant's motion for summary judgment on the ground that plaintiff failed to take FMLA protected leave is denied.

2. *Plaintiff established a prima facie case of retaliation because he demonstrated a causal connection between his protected activity and his termination.*

As noted above, plaintiff must satisfy a three-part test in order to have a prima facie claim of retaliation under the ADA, PHRA, and FMLA. He must prove that (1) he engaged in protected activity; (2) his employer took adverse action after or contemporaneous with his protected activity; and (3) a causal link exists between his protected activity and the employer's adverse action. *Abramson v. Wm. Paterson College of N.J.,* 260 F.3d 265, 286 (3d Cir.2001). The court determined that plaintiff's retaliation claim founded upon the Class C violation he received failed to meet the prima facie case for retaliation because the Class C violation did not constitute an adverse employment action. At issue with respect to plaintiff's retaliation claim founded upon his termination is whether plaintiff demonstrated a sufficient causal link between his protected activity—his complaint to store manager Williams about the Class C violation he received—and his subsequent dismissal.

The United States Court of Appeals for the Third Circuit articulated two main factors that are relevant with respect to establishing a causal link to satisfy a prima facie case of retaliation: (1) timing and/or (2) evidence of ongoing antagonism. *Abramson v. Wm. Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir.2001) ("Temporal proximity ... is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."). The United States Court of Appeals for the Third Circuit is somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–921 (3d Cir.1997) ("Temporal proximity is sufficient to establish the causal link."); *Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir.1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); *but c.f. Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir.1991) (following bench trial, court determined "as a matter of fact" the timing of the plaintiff's discharge alone did not raise an inference of retaliation); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing, however, in conjunction with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir.2000). For example, timing combined with evidence of inconsistent reasons given

by an employer for an employee's termination was held to satisfy the causation prong of the prima facie case. *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir.1986). *See also Abramson*, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see also EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753–54 (3d Cir. 1997), cert. denied, 522 U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998).

In this case, plaintiff contends that he met the causation prong by advancing evidence of timing plus inconsistent explanations from defendant over who actually fired him. As recited above in the background, although Lowe's indicated that area human resources manager Dawson, district manager Seidle, and store manager Williams were all involved in the decision to terminate Sabbrese, all three denied making the ultimate decision to discharge Sabbrese in their depositions. Defendant concedes that there are some inconsistencies over who actually made the ultimate decision to terminate plaintiff; however, defendant argues that there are no inconsistencies with respect to the reason for Sabbrese's termination: his committing a Class A infraction by putting his hands on a co-worker. The fact that no one in defendant's upper-level management actually took responsibility for the ultimate decision to discharge plaintiff, however, is circumstantial evidence that supports the inference of causation no less substantially than circumstantial evidence of inconsistent reasons given by an employer for terminating the employee. *See Farrell*, 206 F.3d at 281. Furthermore, in this case there is another "plus" factor in connection with timing and inconsistent explanations: the fact that plaintiff, who

allegedly committed a serious infraction that would be considered battery under the civil law and assault under Pennsylvania criminal law, was permitted to complete his shift and return to work for the next two weeks until his termination. Based upon defendant's representation of the seriousness of plaintiff's offense, an inference of pretext arises where an individual alleged to have committed a serious infraction would be permitted to complete his shift the same day that he committed the offense without further discipline, only to be later terminated two weeks after lodging a complaint about discriminatory treatment with the store manager.

■ The court finds that plaintiff met the causal link requirement of his prima facie case by presenting evidence that: (1) he was terminated two weeks after he complained to store management; (2) defendant's management officials gave inconsistent explanations about who authorized his firing; and (3) plaintiff was permitted to continue working after allegedly committing a violation so severe that he could have been immediately terminated. Accordingly, summary judgment on the basis of plaintiff's failure to satisfy his prima facie case of retaliation is denied.

3. *Plaintiff submitted sufficient evidence to allow a factfinder reasonably to conclude that defendant's legitimate, non-discriminatory reason for terminating plaintiff's employment was pretextual.*

Under step two of the *McDonnell Douglas* framework, where the plaintiff establishes the prima facie case of discrimination, a presumption arises that the employer unlawfully discriminated against the employee, shifting the burden of production to the defendant to "articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. *See also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[11] Defendant is not required to meet this burden by a preponderance of the evidence, but rather "the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. 1089. If this burden of production is met by the defendant, the ultimate burden of persuasion shifts back to plaintiff to prove "that the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated against the plaintiff." *Jalil*, 873 F.2d at 706 (*citing Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089).

At the summary judgment stage, this requires the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more than likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d

**11.** "[A]lthough the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plain-tiff remains at all times with the plaintiff.' " *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742 (*citing Texas Dept. of Community Affairs*, 450 U.S. at 253, 101 S.Ct. 1089).

Cir.1994). To survive summary judgment, the plaintiff must submit evidence that allows the factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (citations omitted). This requires the non-moving plaintiff to "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* (citations omitted). The necessary evidence may consist of the evidence submitted by the plaintiff in the prima facie case, as well as additional evidence rejecting the employer's legitimate non-discriminatory reason as pretextual. *Id.*[12] In this case, the same evidence relied upon by plaintiff to establish his prima facie case is relied upon by plaintiff to demonstrate that there is a material issue of fact as to whether defendant's asserted reasons were pretextual.

Lowe's asserts that it presented a legitimate, non-discriminatory reason for Sabbrese's discharge—pushing a co-worker in violation of company policy—and that Sabbrese failed to present evidence that a reasonable factfinder could rationally reject that articulated reason as pretextual. Sabbrese, in contrast, argues that Lowe's did not articulate a legitimate, non-discriminatory reason for his discharge because Lowe's failed to identify the actual individual who made the ultimate decision regarding his termination. Sabbrese contends that since the record reflects that no one actually made the decision to termi-

nate him, Lowe's failed to articulate through the admissible evidence the reasons for his discharge other than by arguments of counsel. *See Burdine,* 450 U.S. at 255, 101 S.Ct. 1089. The court disagrees with plaintiff's contention. All of the management officials identified by Lowe's as being involved in the decision to terminate Sabbrese—area human resources manager Dawson, district manager Seidle, and store manager Williams—articulated the same reason for Sabbrese's termination. *See* Dawson Dep. at 21; Seidle Dep. at 9; Williams Dep. at 38, 51. What helped to raise the inference of discrimination, and what contributed to the court's finding that plaintiff presented sufficient evidence to meet his prima facie case (along with the timing of plaintiff's discharge and defendant's failure to timely terminate, or even suspend plaintiff following an allegedly serious infraction), was the fact that none of these management officials acknowledged that they actually made the ultimate decision to fire Sabbrese and the different views of what actually happened—i.e., the incidental touching described by Sabbrese versus the pushing described by Lowe's. *See* Pl. State. ¶ 25; Def. State. ¶ 32–33. The court finds that defendant articulated a legitimate, non-discriminatory reason for plaintiff's termination, and that the evidence of inconsistent explanations given by defendant's management officials will be properly considered by the court to ascertain whether a reasonable factfinder could conclude that the articulated reason was pretextual.

■ Lowe's argues that Sabbrese failed to rebut its articulated reason for his termination because plaintiff conclusively made contact with Smitley at the November 8, 2001 meeting. The issue in this case, however, is not whether Lowe's cor-

---

**12.** Evidence presented in the prima facie case may be sufficient, standing alone, to rebut defendant's articulated legitimate reason and

defeat a motion for summary judgment. *Fuentes,* 32 F.3d at 764.

rectly determined that Sabbrese's behavior constituted a Class A infraction under Lowe's internal company policy. As Lowe's correctly points out in its brief in support of summary judgment, the function of this court is not to "sit as a super-personnel department that reexamines an entity's business decisions." *See Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 332 (3d Cir.1995). In the absence of an impermissible motive, employers are free to use their business judgment to make personnel decisions without being second-guessed by the courts. *Billet v. CIGNA Corp.,* 940 F.2d 812 (3d Cir.1991). Where discrimination is alleged in connection with an employment decision, however, the court is required to inquire "whether the employer gave an honest explanation of its behavior." *Brewer,* 72 F.3d at 332 (*citing McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992)). In this case, the evidence submitted by plaintiff in his prima facie case is sufficient to create a reasonable question regarding the honesty of defendant's explanation that must be resolved at trial by the trier of fact. The court finds that the following facts constitute "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable fact finder could determine "unworthy of credence" and a pretext for discrimination: the timing of Sabbrese's termination; the fact that no one at Lowe's acknowledges making the ultimate decision to fire Sabbrese; and the fact that Sabbrese was permitted to complete his shift and continue working until his termination two weeks later despite

allegedly exhibiting dangerous propensities. *Fuentes,* 32 F.3d at 765. Accordingly, summary judgment on the ground that plaintiff failed to rebut defendant's articulated legitimate, non-discriminatory reason is denied.

## C. FMLA Interference Claim

Defendant and plaintiff both filed motions for summary judgment on plaintiff's FMLA interference claim. Defendant contends that it is entitled to summary judgment because Lowe's did not deny Sabbrese any substantive rights under the FMLA, i.e., Sabbrese was able to take leave in order to control his diabetic condition on November 8, 2001. In contrast, Sabbrese asserts that Lowe's actions in giving him a Class C violation for leaving in order to eat to control his diabetic condition "discouraged" his rights under the FMLA and had a "chilling" effect on his future exercise of those rights. To resolve this matter the court will review the language of the FMLA, the implementing regulations proscribed by the Department of Labor, and relevant case law.

The FMLA provides that it is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any rights provided under the FMLA, including plaintiff's right to take intermittent leave when medically necessary. 29 U.S.C. § 2916(a).[13] Section 825.220(a) of the implementing regulations states that "[t]he FMLA prohibits interference with an employee's rights under the law, and with legal proceedings or inquiries relating to an employee's rights." 29 C.F.R. § 825.220(a).[14] The scope of what

---

13. Previously in this opinion the court categorized Sabbrese's actions on November 8, 2001 as intermittent leave based upon defendant's concession made at the summary judgment hearing that Sabbrese left Lowe's because it was medically necessary for him to eat to control his blood sugar. *See supra* at 321–22.

14. "[A]n agency regulation has the force and effect of law if: (1) the power to legislate on the subject and to promulgate the rule in question has been granted the agency by Congress and the regulation was promulgated in conformity with the congressionally mandated limitations; and (2) the regulation is a

constitutes interference is described in subsection 825.220(b): "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, *but discouraging an employee from using such leave.*" *Id.* § 825.220(b) (emphasis added). Neither the statute nor the implementing regulations define what it means to be "discouraged" from exercising rights under the FMLA, and the United States Court of Appeals for the Third Circuit has not yet addressed this issue.[15] Several district courts, however, have considered the issue in similar factual contexts.

In *Williams v. Shenango, Inc.*, 986 F.Supp. 309 (W.D.Pa.1997), an employee brought suit alleging that his employer retaliated against him in violation of the FMLA, discriminated against him because of his race, and interfered with his attempt to take FMLA leave. In that case, Williams, who worked for his employer for 22 years, requested one week of leave in July 1994 after his wife underwent surgery. *Id.* at 313. His employer denied the request and offered Williams the option of taking a different week off. *Id.* Williams rejected the option and called off work the week of July 21, 1994, following his wife's surgery. His employer initially treated the absence as unexcused and unauthorized, but later dropped the charges after determining that the absence was authorized under the FMLA. Williams was eventually terminated in January 1995 for violating a "Last Chance Agreement" with his employer, drafted after he missed excessive days from work. *Id.* at 313. After

Williams brought suit, his former employer moved for summary judgment. Applicable to the present case is the court's discussion in its summary judgment opinion of Williams's FMLA interference claim based upon his employer's denial of his initial request for leave in July 1994.

With respect to Williams' interference claim, his employer argued that Williams failed to prove his prima facie case because "he received any leave to which he was entitled" and he was not disciplined for taking leave. *Id.* at 320. Williams disagreed, asserting that the term "interfering with" an employee's exercise of FMLA rights "includes discouraging an employee from taking such leave." *Id.* The court agreed with Williams, noting that the undisputed record demonstrated that Williams requested leave and that the request was denied. The court also stated that the fact Williams was not disciplined for taking leave was irrelevant to plaintiff's FMLA interference claim, and would only be considered with respect to his FMLA retaliation claim. Considering the merits of Williams' FMLA interference claim, the court concluded:

> The denial of the request could certainly be construed as interfering with the exercise of FMLA rights, as could Shenango's suggestion that Williams take leave on a different week. Indeed, when Williams left, against orders denying him leave, he may have believed that he was doing so at his own risk, and without the assurances sought to be provided under the FMLA. The lack of

---

substantive (or 'legislative'), rather than an interpretative, rule." *United States v. Walter Dunlap & Sons, Inc.*, 800 F.2d 1232 (3d Cir. 1986) (*citing Chrysler Corp. v. Brown*, 441 U.S. 281, 301–03, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)). In this case, neither party challenged the implementing regulations as beyond the scope of the statute and the regulations will be considered by the court.

**15.** The dictionary defines the term "discourage" as: 1. To deprive of confidence, hope, or spirit. 2. To hamper by discouraging; deter. 3. To try to prevent by expressing disapproval or raising objections. THE AMERICAN HERITAGE DICTIONARY 531 (3d ed.1992).

assurances could be construed as "discouraging" an employee from asserting FMLA rights. The fact that Shenango may, ultimately, have retroactively designated this leave as covered by the FMLA does not negate the possibility that its initial response to Williams' request may have "chilled" or otherwise discouraged Williams' assertion of FMLA rights. Certainly, Shenango has not identified any cases suggesting that § 2615(a)(1) violations may be retroactively remedied. Reasonable persons could conclude that the initial denial of leave and the suggestion of rescheduling leave may, in fact, constitute "interference with" FMLA rights.

*Id.* at 321 (emphasis added). The court denied the employer's motion for summary judgment. The language of the opinion suggests that the court found that it was a material issue of fact whether Williams was actually discouraged from exercising rights under the FMLA, as the court stated: "Reasonable persons could conclude that the initial denial of leave and the suggestion of rescheduling leave may, in fact, constitute 'interference with' FMLA rights." *Id.* A review of the docket of this case shows that the case was settled prior to trial, and that there was never a determination from the finder of fact regarding whether Williams was discouraged in exercising his rights under the FMLA.

In *Shtab v. Greate Bay Hotel and Casino, Inc.*, 173 F.Supp.2d 255 (D.N.J.2001), an employee who was terminated by his employer brought suit alleging that his employer violated the FMLA. The plaintiff, Shtab, was employed as a cook by Greate Bay Hotel and Casino, Inc. d/b/a the Sands Hotel & Casino from July 1993 until February 1998, when he was laid off because the restaurant at which he worked was closed. *Id.* at 258. During his lay-off, his son was diagnosed with autism and Shtab's wife became ill. *Id.* Thus, Shtab became the primary caregiver for his son,

who required constant supervision and care. *Id.*

The Sands issued an employment recall letter to Shtab on May 15, 1998, requesting a response from him in seven days. *Id.* Shtab contacted the Sands on May 22, 1998, and was informed he had to work the next day, May 23, 1998, which was the Saturday of Memorial Day weekend. *Id.* Shtab requested that his family leave begin immediately in order to care for his son. *Id.* Upon hearing his request, the Manager for Employee Relations asked Shtab to delay his leave until after the Memorial Day weekend. *Id.* at 259. Shtab stated he could not delay his leave because he had no one to care for his son while he was at work. *Id.*

Shtab was given a Leave of Absence Application Form, a doctor's certification form, and the Sand's Employee Responsibilities for Leaves of Absence manual. *Id.* He completed the application form, requesting leave to begin the next day, May 23, 1998, and to end June 23, 1998. *Id.* Because his leave request was not yet approved, he was informed he had to call into his department each day to inform the department of his absence. *Id.* Shtab called into his department each day, as instructed. He then gave the medical certification from his son's physician to defendant's Benefit Specialist. The certification provided for intermittent leave to begin on May 28, 1998 and continue until September 1998 and noted that additional evaluations were possible. *Id.* Defendant fired Shtab because the medical certification did not explain Shtab's absences over the Memorial Day weekend. Shtab claimed that defendant did not inform him of the precise nature of the discrepancies between the certification and his leave application, and that he was not given an opportunity to correct the certification's problems. *Id.* Shtab subsequently submitted new certifi-

cations, including a letter from his son's doctor that recommended continuous leave from May 23, 1998, to September 14, 1998; however, the Sands refused to reconsider the termination based upon the new information contained in the subsequent certifications. *Id.*

One aspect of Shtab's FMLA interference claim was that the Sand's suggestion that he take different dates of leave constituted interference with his FMLA rights. The Sand's brought a motion for summary judgment, arguing that an employee must actually suffer some adverse employment action directly due to the alleged interference with FMLA before maintaining an action for interference under § 2615(a)(1). The court disagreed, and held, similar to *Williams,* that "reasonable persons could conclude that [the benefit specialist's] request 'chilled' Shtab's assertion of his rights under the FMLA or could conclude that Shtab's decision to take leave over the Memorial Day weekend contributed to the Sand's ultimate denial of his request." *Id.* at 268. The court denied the Sand's motion for summary judgment and held the case over for trial.

Lowe's attempts to distinguish *Williams* and *Shtab* from the present case, arguing that it did not deny a request for leave from Sabbrese or suggest that leave be rescheduled, and that its actions did not constitute an interference with Sabbrese's rights under the FMLA. Lowe's cites *Alifano v. Merck & Co., Inc.,* 175 F.Supp.2d 792 (E.D.Pa.2001), for the proposition that FMLA interference claims require that the alleged interference cause the employee to forfeit FMLA protections. In *Alifano,* a former security officer diagnosed with fibromyalgia and chronic fatigue syndrome brought suit alleging that defendant interfered with her rights under the FMLA. *Id.* at 793. After Alifano took a medical disability leave of absence, she informed her employer that she could re-

turn to work under certain restrictions. *Id.* Faced with these restrictions, her employer attempted to find a suitable position for her. *Id.* Alifano was a security officer stationed in the northeastern part of the United States, and her employer offered her a position in Los Angeles. *Id.* Alifano declined the offer, asserting that it did not accommodate her medical restrictions. *Id.* She was eventually terminated for job abandonment after she failed to return to her security position. Alifano's FMLA suit advanced several grounds for relief, including an interference claim under 29 U.S.C. § 2615(a) alleging that her employer discouraged her from exercising her rights under the FMLA.

The court granted the employer's motion to dismiss on the FMLA interference claim, finding that there cannot be a valid claim for interference in the absence of an injury under the act, such as denying entitlement to leave or failing to restore an employee to a previous position. *Id.* at 794. Because Alifano failed to allege that she was denied leave or that she was not restored to a previous position after taking leave, the court held that she failed to state an FMLA interference claim. *Id.* The court, however, did not cite to *Williams* or *Shtab,* and did not comment on the implementing regulations, which provide that interference under the FMLA includes "discouraging" an employee from taking leave.

Lowe's also cites *Burch v. WDAS AM/ FM,* No.CIV.A.00–4852, 2002 WL 1471703 (E.D.Pa. June 28, 2002), in an attempt to distinguish *Williams* and *Shtab.* In *Burch,* the plaintiff brought suit alleging racial discrimination and FMLA retaliation and interference. With respect to Burch's FMLA interference claim, he alleged that his supervisor discouraged him from using FMLA leave by not responding promptly to an email request for leave and for send-

ing Burch an email while he was on leave stating that his monthly report was overdue. The court held that Burch failed to state an FMLA interference claim. The court noted that the email to Burch's supervisor did not call for a written response, and that Burch's supervisor verbally approved the leave. Thus, in that case a leave request was not denied as in *Williams* or *Shtab.* Neither was Burch reprimanded in any way for taking FMLA leave, as the court determined that the actions of Burch's supervisor in reminding him of overdue reports while he was on FMLA leave did not constitute discouragement because an employer "is not required to excuse performance by an employee on the days he is on the job." *Id.* at *9.

■ Unlike *Alifano* and *Burch,* the facts of this case state a claim for FMLA interference. The undisputed record demonstrates that Lowe's was aware that Sabbrese had diabetes. Lowe's does not dispute that Sabbrese's blood sugar dropped below favorable levels on November 8, 2001, and does not dispute that Sabbrese needed to eat in order to control his blood sugar. Sabbrese went on his lunch break, characterized by this court as unforeseeable intermittent leave, allegedly without following company procedures. When Sabbrese returned from his break, he informed Lowe's officials why he left, complying with the requirements of 29 C.F.R. § 825.303 concerning notification of unforeseeable leave. Despite Sabbrese's compliance with notification procedures

under the FMLA, he was given a Class C disciplinary warning under Lowe's progressive disciplinary scheme, without Lowe's even asking for a medical certification as permitted under 29 U.S.C. § 2913(a).[16]

It is true that the facts of the present case differ from *Williams* and *Shtab* because Lowe's did not deny Sabbrese's request for leave or suggest that he wait until Grayson returned from lunch to take leave. Disciplining Sabbrese for taking permitted leave, however, is arguably a more egregious "chilling" of his rights under the FMLA because he was actually penalized for exercising his right to take intermittent leave when medically necessary. Certainly, the discipline imposed on Sabbrese may have left him, like the plaintiffs in *Williams* and *Shtab,* without reasonable assurances that he would be permitted to exercise his FMLA rights without interference in the future. Lowe's employment policies cannot trump the substantive provisions of the FMLA and the implementing regulations. The court finds that reasonable persons could conclude that the discipline imposed on Sabbrese, after Lowe's acknowledged that Sabbrese needed to take leave in order to control his blood sugar, "chilled" or otherwise discouraged Sabbrese's assertion of his FMLA rights. A question of material fact remains with respect to whether Sabbrese was actually discouraged in asserting his FMLA rights.

**16.** Where employees comply with the notification procedures of the FMLA, employers have several protections against employee abuses of FMLA leave:

1. The employer can request a medical certification from an employee requesting leave. 29 U.S.C. § 2613(a);

2. If the employer believes that a certification is incomplete, the employer can request the employee to cure a deficiency in the certification. 29 U.S.C. § 825.305(d);

3. The employer can require the employee to obtain a second opinion from a medical provider chosen and paid for by the employer. If that second opinion is in conflict from the employee's certification, the employer can have a third opinion sought. The employer must also pay for this third opinion, however the medical provider is chosen by both the employer and the employee. The decision of the third healthcare provider is binding. 29 C.F.R. § 825.307.

Accordingly, defendant's motion for summary judgment on plaintiff's FMLA interference claim is denied because defendant's conduct may reasonably be construed as discouraging plaintiff from exercising his rights under the FMLA; however, plaintiff's motion for partial summary judgment on his FMLA interference claim is also denied because a material issue of fact remains for the jury as to whether the Class C violation issued to plaintiff "discouraged" the exercise of his rights under the FMLA.

## II. Defendant's motion to strike plaintiff's request for compensatory and punitive damages and demand for a jury trial on his ADA retaliation claim.

In addition to defendant's motion for summary judgment, defendant also filed a motion to strike plaintiff's request for compensatory and punitive damages and demand for a jury trial on his ADA retaliation claim. (Doc. No. 32). Defendant contends that an ADA retaliation claim may be satisfied by an award of equitable relief, but that compensatory and punitive damages are unavailable. Because equitable damages are the only possible remedy, defendants argue that plaintiff does not have a right to a jury trial on his ADA retaliation claim. Sabbrese asserts that since compensatory and punitive damages are available for retaliation actions under Title VII, they likewise should be available for an ADA retaliation claim.

Lowe's cites *Kramer v. Banc of America Securities LLC*, 355 F.3d 961 (7th Cir. 2004), for the proposition that compensatory and punitive damages are unavailable for ADA retaliation claims. *Kramer* examined the statutory framework of ADA retaliation claims in detail and provides persuasive guidance with respect to the pending motion. The enforcement provision of the ADA is codified at 42 U.S.C. § 12117. That section provides that the available remedies under the ADA are the same as provided in the 1964 Civil Rights Act, 42 U.S.C. § 2000e–4 though e–9. Section 2000e–5(g)(1) of the Civil Rights Act limits the remedies available under that act to equitable relief, including back pay, but does not provide for compensatory or punitive damages. *Kramer*, 355 F.3d at 964. The 1991 Civil Rights Act, 42 U.S.C. § 1981a(a)(2), expanded the remedies available in section 2000e–5(g)(1) to provide for compensatory and punitive damages in certain circumstances. *Id.* With respect to the ADA, section 1981a(a)(2) provided that a complaining party could recover compensatory and punitive damages for violations of section 102 or section 102(b)(5) of the ADA, codified at 42 U.S.C. §§ 12112 and 12112(b)(5). Sections 12112 and 12112(b)(5) deal with an employer's failure to make reasonable accommodations to a qualified employee with a disability, while section 12203—not listed in section 1981a(a)(2)—establishes retaliation claims under the ADA.

After reviewing the applicable statutes, the United States Court of Appeals for the Seventh Circuit concluded that the plaintiff was precluded from recovering compensatory and punitive damages under her ADA retaliation claim. The court determined that section 1981a(a)(2) permitted recovery of compensatory and punitive damages only for the claims listed in that statute, such as section 121112 of the ADA, and since the section establishing retaliation claims under the ADA (42 U.S.C. § 12203) was not listed, compensatory and punitive damages were unavailable. This court adopts the persuasive rationale of *Kramer* and accordingly holds that compensatory and punitive damages are not available.

The United States Court of Appeals for the Third Circuit offered guidance with respect to whether the right to a trial by

jury exists in *Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3d Cir.1988). There, the court stated that "[i]n determining a party's right to a jury trial it is the procedural and remedial sections of the statute creating the right which must be examined." *Id.* at 392. The court concluded that "[w]here the particular remedial section in the statute provides for only equitable remedies then no right to a jury trial exists." *Id.* The court further cautioned that "within a particular statute a right to a jury might exist as to some of the enforcement sections and not as to others," and that courts must be careful to examine the applicable subsections at issue to determine which remedies are available. *Id.* *Cox*, thus, requires the court to examine the statutory provisions of the ADA concerning retaliation claims in order to determine the nature of relief that may be awarded. If the court determines that the remedy is "explicitly equitable, then there is no seventh amendment right to a jury." *Id.* (*citing Curtis v. Loether*, 415 U.S. 189, 194–95, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)).

■ As noted above, since compensatory and punitive damages are not available, the sole remedy for plaintiff's retaliation claims pursuant to the ADA is equitable relief.[17] Under the mandate of *Cox*, because plaintiff's sole remedy under his ADA retaliation claim is equitable, plaintiff is not entitled to a jury trial on that claim. Accordingly, defendant's motion to strike is granted.

### Conclusion

**AND NOW,** this **9th** day of **June 2004,** upon consideration of cross-motions for summary judgment filed by defendant (Doc. No. 30) and plaintiff (Doc. No. 33), the motion to strike compensatory and pu-

nitive damages and demand for jury trial filed by defendant (Doc. No. 32), the responses of the parties, and the arguments of counsel, **IT IS ORDERED** that defendant's motion to strike is **GRANTED,** plaintiff's partial motion for summary judgment is **DENIED,** and defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part as follows:

Summary judgment is **GRANTED** in favor of defendant with respect to plaintiff's retaliation claims under the FMLA, ADA, and PHRA regarding the Class C disciplinary warning plaintiff received because that warning, even as part of a progressive discipline scheme, did not constitute an adverse employment action. In all other respects defendants' motion for summary judgment is **DENIED.**

---

**17.** Neither the court nor any of the parties were able to locate any decisions in which the United States Court of Appeals for the Third Circuit implicitly upheld an award of compensatory or punitive damages for ADA retaliation claims.